IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,236

STATE OF KANSAS,
*Appellee*,

v.

MARLON ANDREW FORD,
*Appellant*.

SYLLABUS BY THE COURT

1.

When a defendant is charged with rape as defined in K.S.A. 21-3502(a)(1) for an offense committed before July 1, 2011, and the evidence presented at trial suggests the victim initially consented but withdrew consent after penetration and sexual intercourse continued despite withdrawal of consent, the trial court must instruct the jury on the elements of rape and give an additional modified *Bunyard* instruction.

2.

A modified *Bunyard* instruction informs the jury that a rape may occur even though consent was given to the initial penetration, but only if the consent is withdrawn, that withdrawal is communicated to the defendant, and the sexual intercourse continues under circumstances where the victim is overcome by force or fear.

3.

A clearly erroneous standard of review applies to a trial court's failure to give a jury instruction where the party neither requested the instruction nor objected to its omission.

1

4.

A prosecutor's comments fall outside the wide latitude afforded the State in conducting its case when they misstate the law or argue a fact or factual inference with no evidentiary foundation.

5.

Rape is statutorily defined as knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse when the victim is overcome by force or fear. K.S.A. 21-5503(a)(1)(A).

6.

A prosecutor misstates the law of rape as defined in K.S.A. 21-5503(a)(1)(A) and thus commits legal error by extending the concept of force to conduct that occurred outside the context of the sexual intercourse act, but in this case the error was harmless beyond a reasonable doubt.

7.

K.S.A. 21-5503 does not violate either prong of the federal void-for-vagueness test.

Review of the judgment of the Court of Appeals in an unpublished opinion filed February 10, 2023. Appeal from Sedgwick District Court; JEFFREY L. SYRIOS, judge. Oral argument held November 1, 2023. Opinion filed June 27, 2025. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed. Conditional cross-petition for review improvidently granted.

*Kai Tate Mann*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, *Derek Schmidt*, former attorney general, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellee.

PER CURIAM:  After a jury convicted Marlon Andrew Ford of rape, a Court of Appeals panel affirmed his conviction and sentence. On review, Ford argues the panel erred in holding that (1) he failed to request a modified *Bunyard* jury instruction; (2) the trial court's failure to give a modified *Bunyard* jury instruction was not clearly erroneous; (3) the prosecutor did not commit reversible error during closing argument; (4) the rape statute is not unconstitutionally vague; and (5) the cumulative effect of the alleged errors did not violate his right to a fair trial.

In a conditional cross-petition for review, the State asserts a modified *Bunyard* jury instruction is not legally appropriate in any case for a charge of rape committed after July 1, 2011, when the Kansas Legislature amended the rape statute. And even if it could be legally appropriate after the amendment in some cases, the State argues a modified *Bunyard* instruction was unwarranted under the facts present here.

For the reasons below, we affirm Ford's conviction. First, we agree with the panel that Ford failed to request a modified *Bunyard* jury instruction, so we review for clear error. Although we assume, without finding, that the trial court erred in failing to give a modified *Bunyard* instruction to the jury, we are not firmly convinced the jury would have reached a different verdict without the instructional error. Because we assume for purposes of our clear-error analysis that a modified *Bunyard* instruction was legally appropriate, the State's conditional cross-petition on this issue is dismissed as improvidently granted. Second, we find any misstatement made by the prosecutor during closing argument did not constitute reversible error. Third, we find K.S.A. 21-5503 is not unconstitutionally vague. Finally, we conclude the cumulative error doctrine provides no basis to reverse Ford's conviction.

3

In April 2018, the State charged Ford with raping M.L. The case went to a jury trial, where the parties presented conflicting evidence about whether the sexual intercourse was consensual. The relevant evidence is summarized below.

*The State's evidence*

Ford and M.L. attended the same Kansas City high school where Ford was two years ahead of M.L. They had little contact during high school but knew each other through one of M.L.'s friends.

M.L. attended Kansas City Kansas Community College in 2015 and 2016. During this time, she and Ford were in the same circle of friends. One night in the summer of 2016, Ford was drunk and kissed M.L. She did not reciprocate, claiming Ford "tr[ied] to, like, frisk me, touch me and stuff, but I didn't want that to happen." M.L. and Ford later developed a friendship that included talking on the phone, texting, FaceTiming, and messaging through Snapchat. Once, in the summer of 2017, M.L. and Ford went out to a restaurant and a movie, but M.L. denied it was a date and claimed Ford knew they were just friends. When they were out, Ford attempted to touch M.L.'s backside, and M.L. "tried to tell him that's not what I want it to be." Ford also asked M.L. for a kiss, but she declined, telling him, "[T]his is not a date."

In the fall of 2017, M.L. left Kansas City to attend Wichita State University (WSU), where she lived in an on-campus apartment with three other women. After moving to Wichita, M.L. did not communicate with Ford as often, although they did have some contact over the phone and social media.

4

On November 30, 2017, Ford tried to call M.L. three times, but she did not answer. The next evening, December 1, Ford reached out to M.L. through Snapchat. He said he was going through a difficult time and needed a friend, and he complained M.L. did not love him. M.L. called Ford at 10:15 p.m. and talked to him for almost 23 minutes. During the phone call, Ford expressed thoughts of self-harm and suicide. M.L. tried to help Ford talk through his feelings and encouraged him to find a purpose in life. Ford said he wanted to see M.L., but she told him it was not a good idea. At one point, Ford told M.L. he was getting on the highway to drive to Wichita, but she said she did not want to see him. Ford relented, and the conversation ended. M.L. denied giving Ford directions to her apartment but said she had once told him what apartment she lived in.

After her conversation with Ford, M.L. watched television and talked on the phone with her mother. Between 10:44 p.m. and 11:03 p.m., M.L. missed four phone calls from Ford while she talked with her mother. Ford also messaged M.L. during this time period saying he was on the highway and was coming to see her. M.L. did not immediately respond to Ford because she did not see the messages until she got off the phone with her mother. M.L., feeling as though Ford was not listening to her, called him at 11:09 p.m. During the approximately 90-second phone call, M.L. told Ford, "Do not come," "You were not invited," and, "Whatever you want to talk about we can talk on the phone." Ford responded, "Okay," but again told M.L., "You don't love me."

After this phone call, M.L. went to sleep. Around 2:48 a.m. on December 2, M.L. woke up to use the bathroom. She checked her phone and saw that between 2:14 a.m. and 2:47 a.m., she had more than a dozen missed calls and four text messages from Ford. These text messages read:

- "Headed yo way"
- "I'm on the highway now"

- "I just drove 3 hrs to sleep in the car bro"
- "Thanks for the flunkie mission dude"

Upset, M.L. called Ford at 2:48 a.m. to confront him. Ford said he was hurt and sad. M.L. responded that she could not help him and that he should work on himself and pray. Ford asked M.L. to let him come inside her dorm because he did not want to sleep in the car and wanted to talk to her face-to-face. M.L. initially refused because she had not invited him, but she eventually agreed to let Ford inside because they were friends and she wanted to talk to him. After letting him in through a side entrance, M.L. hit Ford on the shoulder to express how she felt about him not listening to her and said she had to get up around 6:30 a.m. to teach an ACT prep class.

Once inside M.L.'s shared apartment, she and Ford went straight into her bedroom. M.L. sat on her bed and Ford sat on her desk chair while they talked. Ford took off his hat and headphones and put them on M.L.'s desk, along with some change from his pocket. Ford asked for a kiss and M.L. said no. Ford brought up sex, asking M.L., "We fucking[?]" M.L. said no and reminded Ford she did not want a sexual relationship with him. Ford "laughed it off and played it off like he knew, like okay." The two kept talking about Ford's plans for the future until M.L. fell asleep on top of the covers on her bed, propped up against a large body pillow.

M.L., who was wearing pants and a long-sleeved shirt, later awoke to find Ford naked and on top of her. He had pulled her down flat on the bed, pinned her legs under his, and gripped her wrists as he held her arms above her head. M.L.—who is 5'2" tall and weighs 108 pounds—could not move with Ford's 5'10," 150-pound frame on top of her. Ford pulled M.L.'s shirt up, pressed her mouth with his face, and then licked her neck and her breast. M.L. told Ford to stop and said, "[N]o," and, "This ain't right." Ford then spread M.L.'s legs, pulled down her pants and underwear to right above her knees, and repeatedly said, "'I'm going to fuck you.'"

Despite M.L.'s continued pleas to stop, Ford forced his penis inside her vagina. M.L. cried as Ford thrust inside her for about a minute. M.L. knew she "had to do something or he wasn't going to stop." M.L. managed to free one of her hands and hit Ford with a closed fist, causing him to fall off her and onto the bed. As M.L. tried to get up, Ford pulled her down from behind and again penetrated her vagina with his penis.

Eventually, M.L. managed to throw herself out of the bed. She pulled up her pants, threw Ford's clothes at him, hit him, and yelled at him to get out. Ford had ejaculate in his hands and on his penis and went into the bathroom to clean himself. M.L. recalled that Ford moved slowly as she tried to get him out of her room and toward the front door of the apartment. As Ford was leaving, he told M.L., "[D]on't talk about it," or, "'Don't tell anyone.'"

M.L. returned to her room and saw small specks of blood on her bed. Sometime around 5:30 a.m., M.L. heard a knock on her front door. After M.L. did not answer the door, she got a text message from Ford that said, "My keys to[o]." After locating Ford's keys, M.L. cracked open the door and threw the keys outside, telling Ford that she planned to call the police.

M.L. went back to her bedroom, sat on her bed, and cried, trying to tell herself that nothing had happened. Eventually, she went into the bathroom, took off her pants, and saw "blood everywhere." M.L. sat down in her shower but did not remember showering. She got dressed and went to work, still in denial about what had happened. M.L. continued to tell herself nothing had happened until she received a text message from Ford "that reassured [her] that something did happen bad." The message read, "Yo I apologize [three sad face emojis] you know I love uuu [M.L.]" That morning, Ford sent M.L. four more text messages:

- "Please don't throw away my hat and watch. Just beat my ass and throw"
- "them at me next time you see me."
- "Mail it to me"
- "Just hold on to it till uu don't hate the thought of me"

Seeing these messages caused M.L. to run to the bathroom and cry.

After work, M.L. returned to her apartment. Still unsure about what had happened to her, she watched episodes about rape cases on Netflix. M.L. eventually told her roommate, C.M., what Ford had done. According to C.M., M.L. cried as she shared that she had been "assaulted" or "attacked" and struggled to say the word "rape" more than once. C.M. eventually persuaded M.L. to go to the emergency room for a rape kit. M.L. cried as C.M. drove her there.

Around 11:30 p.m., M.L. met with a forensic nurse. M.L. talked to the nurse for about 40 minutes and tearfully recounted the events generally as described above. M.L. said she did not want to report the incident to law enforcement. During a genital exam, the nurse noted "copious amounts of blood" coming from a large laceration on M.L.'s labia minora. The nurse later testified a laceration is a tear caused by blunt force. The nurse concluded M.L.'s injury was consistent with the history she had provided.

Saliva found on M.L.'s breasts belonged to a mixture of two individuals. M.L. and Ford could not be excluded as contributors to this DNA profile. When Ford's DNA was compared, the odds of selecting another unrelated person at random whose DNA would have matched the saliva found on M.L.'s left breast was one in 1.37 nonillion; the odds were one in 29 octillion for the saliva found on M.L.'s right breast.

M.L. reported the rape to law enforcement on December 8, 2017. That day, she provided a statement to WSU Police Officer Matthew Rose. Four days later, M.L. sat for a recorded interview with WSU Police Detective Jeffery Rider. Law enforcement verified Ford was in Wichita on December 2, 2017. Kansas Turnpike Authority records showed Ford entered the turnpike in Bonner Springs around 11:15 p.m. on December 1, 2017, and exited the turnpike at K-96 highway in Wichita around 2:13 a.m. on December 2. Law enforcement recovered Ford's hat, watch, carabiner, and change from M.L.'s bedroom.

Detective Rider coordinated with the Kansas City, Kansas, Police Department to locate Ford in Kansas City. When Detective Rider told Ford they wanted to talk to him about an incident that had happened in Wichita the week before, Ford's only comment was, "[W]hy, what did she say[?]" Later, Ford sent M.L. several text messages, including one message suggesting he would tell law enforcement that M.L. was on top of him and was the one who initiated the sexual intercourse.

*Ford's evidence*

Ford testified at trial. Ford said he had known M.L. since high school and claimed she shared pictures of her nipple piercings with him in 2015. Ford admitted M.L. was never his girlfriend but said she had introduced him to her mother and their relationship turned sexual in the summer of 2017. Ford claimed he and M.L. went to "third base," which he described as "kissing and fondling" and "touching . . . each other's sex organ" with his pants down and hers "half-way down." Ford also mentioned a specific incident at M.L.'s sister's house when he and M.L. kissed and he rubbed his penis on her vagina, but they stopped short of intercourse. That summer, Ford told a friend that he was romantically interested in M.L. Based on this conversation and the friend's interactions with them, the friend was under the impression that Ford and M.L. were in a romantic relationship.

9

Ford testified M.L. invited him to Wichita the weekend of December 2, 2017. But Ford admitted he did not bring a bag or toiletries with him on the trip. Ford also acknowledged he called M.L. at least a dozen times and sent her several frustrated text messages from the apartment parking lot.

When Ford went into M.L.'s bedroom, he took off his hat and watch. According to Ford, he and M.L. talked for five minutes and then began kissing. Ford took off his shirt and helped M.L. remove her pants, and they touched each other's genitals. After "one thing led to another," M.L. asked Ford if he had a condom. Ford testified he retrieved the single condom he brought, and they began to have consensual sexual intercourse. At some point, the intercourse stopped, and Ford removed the condom while he and M.L. cuddled on her bed. But a few minutes later in his testimony, Ford retracted the statement that he and M.L. had sexual intercourse at that point and instead referred to it as an act of "sexual intention," claiming he removed the condom because no intercourse occurred then. After cuddling, Ford testified he and M.L. began kissing again, he got on top of M.L. and started kissing her breasts and, without a condom, inserted his penis into her vagina. After 25-60 seconds, M.L. stopped the sex "abruptly," accused Ford of only wanting sex from her, and told him to leave. Ford said he immediately stopped all sexual activity at this time and denied he ejaculated. Ford left the apartment and drove back to Kansas City after retrieving his keys from M.L. Ford later messaged M.L. to apologize about "the fight."

*The State's rebuttal evidence*

On rebuttal, M.L. admitted she had shared pictures of her breasts on social media and on FaceTime calls. She claimed the pictures were meant to show her surgical scars from fibroadenoma tumor removals and she shared them to raise awareness of the disease and to rebuild her body confidence.

10

After M.L.'s rebuttal testimony, the trial court issued instructions to the jury and both sides presented closing arguments. During deliberations, the jury asked for the definition of rape and requested a read back of M.L.'s and Ford's testimony. Ultimately, the jury found Ford guilty of rape. The trial court sentenced Ford to 155 months in prison with lifetime postrelease supervision.

On direct appeal, Ford raised multiple trial errors. A Court of Appeals panel affirmed Ford's conviction and sentence. See *State v. Ford*, No. 124,236, 2023 WL 1878583 (Kan. App. 2023) (unpublished opinion).

We granted Ford's petition for review and the State's conditional cross-petition for review. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

Ford raises five issues on review and the State raises a single issue. We combine the parties' arguments into four general issues: (1) whether the trial court erred in failing to provide the jury with a modified *Bunyard* instruction, (2) whether the prosecutor committed reversible error during closing argument, (3) whether K.S.A. 21-5503(a)(1)(A) and (e) are unconstitutionally vague, and (4) whether the cumulative error doctrine applies to warrant reversal. We address each argument in turn.

I. *Modified* Bunyard *jury instruction*

When a defendant is charged with rape as defined in K.S.A. 21-3502(a)(1) for an offense committed before July 1, 2011, and the evidence presented at trial suggests the

11

victim initially consented but withdrew consent after penetration and sexual intercourse continued despite withdrawal of consent, the trial court must instruct the jury on the elements of rape and give an additional modified *Bunyard* instruction. *State v. Flynn*, 299 Kan. 1052, 1067, 329 P.3d 429 (2014). This instruction states that "rape may occur even though consent was given to the initial penetration, but only if the consent is withdrawn, that withdrawal is communicated to the defendant, and the sexual intercourse continues when the victim is overcome by force or fear." 299 Kan. at 1067 (citing *State v. Bunyard*, 281 Kan. 392, 416, 133 P.3d 14 [2006]). We refer to it as "modified" because we corrected the original *Bunyard* instruction in *Flynn*, disapproving the "conclusion that a defendant should be entitled to a 'reasonable time' to discontinue intercourse with a nonconsenting partner." *Flynn*, 299 Kan. at 1066.

In his direct appeal, Ford argued the trial court should have issued a modified *Bunyard* instruction. Finding Ford had not requested this instruction at trial, the panel held it could only review the trial court's failure to give the instruction for clear error. In its clear error analysis, the panel assumed without deciding that the trial court erred in failing to give a modified *Bunyard* instruction to the jury. But the panel concluded the trial court's failure to give the instruction was not clearly erroneous and thus did not warrant reversal. *Ford*, 2023 WL 1878583, at *6-8.

The parties challenge each part of the panel's ruling. Ford argues the panel erred in finding he did not request a modified *Bunyard* instruction at trial and in concluding the trial court's failure to give the instruction was not reversible error. In its conditional cross-petition for review, the State argues a modified *Bunyard* instruction was not factually appropriate and is no longer legally appropriate given legislative amendments to the Kansas rape statute in 2011.

When analyzing jury instruction issues, appellate courts follow a three-step process:  (a) determine whether we can or should review the issue, i.e., whether we have

12

appellate jurisdiction and the parties have preserved the issue for appeal; (b) consider the merits of the claim to determine whether error occurred below, i.e., whether the instruction was legally and factually appropriate; and (c) assess whether the error requires reversal, i.e., whether the error can be considered harmless. Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. *State v. Holley*, 313 Kan. 249, 253-54, 485 P.3d 614 (2021).

A. *Preservation*

When, as here, a party believes the court erred in failing to give a jury instruction, K.S.A. 22-3414(3) requires the party to object by "stating distinctly the matter to which the party objects and the grounds of the objection" unless failing to give the instruction is clearly erroneous. The panel found Ford did not distinctly request a modified *Bunyard* instruction at trial, which resulted in the panel reviewing his claim for clear error. Ford disagrees, claiming he requested "an instruction consistent with the concept of a modified *Bunyard* instruction."

Ford did not submit proposed jury instructions to the trial court. But during the instructions conference, defense counsel objected to several of the State's proposed jury instructions. Relevant here, counsel raised two objections to jury instruction No. 3, which defined the elements of rape and defined sexual intercourse. First, counsel objected to including the following language in the instruction: "It is not a defense that Marlon Ford did not know or have reason to know that [M.L.] did not consent to the sexual intercourse, or was overcome by force or fear." Although acknowledging this language was found in the pattern jury instructions, counsel argued it was an inaccurate statement of the law because it was not included in the rape statute. Second, counsel argued for adding language to the instruction stating sexual penetration alone cannot satisfy the "force or fear" element of rape and that some other force outside the sex act was required. In making this argument, counsel discussed *Bunyard* and *Flynn*:

13

"Yesterday we talked a little bit about the Bunyard case. I know the State was talking about the Flynn case. Flynn didn't really overrule Bunyard. What Flynn did—Bunyard said in a situation where sex is started and somebody wants it to stop that there's a reasonable amount of time to stop. Flynn really just kind of quantified that a little bit more to say, well, because there's an actual human urge that's involved, sometimes you can't just stop on a dime when you're in a sexual event. So the terminology is that more than likely the male in the situation would have to—could only be convicted if they failed to stop through compulsion. I think most people are going to interpret that to be through orgasm or ejaculation or some time beyond just the amount of time that it takes to separate out.

"There's also language in Bunyard talking about the force that's involved has to be more than the sex act itself, and that has not been modified or taken out by Flynn. There's also the State vs. Brooks case that we talked about yesterday. Brooks I think is the case that has to do with if you don't have sex with me I'm going to spread bad rumors about you. There's a lot of discussion in that case about this concept of force. It cites a number of cases that also talk about force.

"I think that it's very clear from all of the case law that the force that's required has to be something more than the sex act itself. I think in a case like this where force is an issue that it's appropriate to add language letting the jury know that the force has to be something above and beyond the sex act itself."

In response to the first argument, the prosecutor pointed out that—contrary to Ford's assertion—the challenged language *was* included in K.S.A. 21-5503(e) and was thus properly included in instruction No. 3. As for Ford's second argument that rape requires force beyond the act of penetration, the prosecutor advised there was no caselaw addressing this issue. The prosecutor then discussed *Flynn* and its modification of *Bunyard* and questioned whether a modified *Bunyard* instruction would be legally or factually appropriate.

14

Following the parties' arguments, the trial court declined Ford's invitation to remove the challenged language in instruction No. 3 because the specific language was included both in the PIK instruction and in K.S.A. 21-5503(e). And, although the court agreed with defense counsel that the sex act itself cannot be used to prove the "force or fear" element of rape, it noted there was no caselaw requiring that the jury be instructed to that effect. In any event, the court clarified the State would be relying on other evidence of force that was independent of the sexual intercourse itself. The judge concluded: "So I'm following PIK. I'm following *Flynn*. I think this is consistent with what I'm being requested to do and not do. So that will be the ruling of the Court."

Based on the record cited above, Ford claims his argument that the rape instruction was legally deficient under *Flynn* was consistent with the concept of a modified *Bunyard* instruction. But review of Ford's arguments at the instructions conference disproves his claim. Defense counsel objected to jury instruction No. 3, the rape elements instruction, on two grounds: (1) counsel argued for removal of the "it is not a defense" language, claiming it was not part of the rape statute and (2) counsel argued for added language stating that sexual penetration alone cannot satisfy the force or fear element of rape. Even if read broadly, these arguments cannot be construed as a request for a modified *Bunyard* instruction, which informs the jury that a rape may occur even though consent was given to the initial penetration, but only if the consent is later withdrawn, that withdrawal is communicated to the defendant, and sexual intercourse continues under circumstances where the victim is overcome by force or fear. And defense counsel did not respond when the prosecutor briefly mentioned the topic in that specific context. Defense counsel only discussed *Bunyard* and *Flynn* as support for the claim that the physical act of penetration alone is not enough to satisfy the force or fear element of rape, which is not the same "concept" as requesting an instruction relating to continued sexual intercourse after the victim withdraws initial consent under circumstances where the victim is overcome by force or fear. In fact, counsel never

15

argued M.L. withdrew consent after sexual intercourse began. In sum, we conclude the panel properly determined Ford did not request a modified *Bunyard* instruction at trial. Thus, under K.S.A. 22-3414(3), we apply a clearly erroneous standard of review. See *State v. Robinson*, 293 Kan. 1002, 1036, 270 P.3d 1183 (2012).

### B. *Legal and factual appropriateness*

At the second step of a jury instruction issue, we evaluate whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. *Holley*, 313 Kan. at 254. To the extent resolution of the issue involves interpreting a statute, this court exercises unlimited review. *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021).

To determine whether a jury instruction is legally appropriate, we review whether the instructions fairly and accurately state the law as it applied to the facts of the case and whether the instructions could have reasonably misled the jury. *State v. Bernhardt*, 304 Kan. 460, 469, 372 P.3d 1161 (2016). To be factually appropriate, there must be sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *State v. Bodine*, 313 Kan. 378, 386, 486 P.3d 551 (2021).

The parties disagree about whether a modified *Bunyard* instruction would have been legally and factually appropriate here. At the heart of the disagreement about legal appropriateness is an amendment to the rape statute, effective July 1, 2011, stating "it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless." K.S.A. 21-5503(e). In *Flynn*, where the rape occurred before July 1, 2011, the court limited its requirement to give a modified *Bunyard* instruction to cases before the statutory amendment and

16

left for another day the determination of whether the instruction would be legally appropriate in force or fear cases for rape offenses committed after July 1, 2011. *Flynn*, 299 Kan. at 1067. At the heart of the disagreement about factual appropriateness is witness credibility. The panel declined to resolve the disagreements about legal and factual appropriateness and instead assumed, without deciding, that the trial court erred in failing to give a modified *Bunyard* instruction to the jury. The panel then proceeded to the reversibility analysis. *Ford*, 2023 WL 1878583, at *7.

Like the panel, we do not find it necessary to determine whether a modified *Bunyard* instruction would have been legally and factually appropriate here because, assuming it was, we are not firmly convinced the jury would have reached a different verdict had the instruction been given. Because we assume for purposes of our reversibility analysis that a modified *Bunyard* instruction would have been legally appropriate, the State's conditional cross-petition for review on this issue is dismissed as improvidently granted.

C. *Clear error*

Because Ford did not object to the claimed instructional error, we apply the clear error standard required under K.S.A. 22-3414(3). Under this standard,

> "the reviewing court determines whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The defendant has the burden to establish reversibility, and, when examining whether the defendant has met that burden, the reviewing court makes a de novo determination based on the entire record." *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023).

Citing *State v. Berkstresser*, 316 Kan. 597, 520 P.3d 718 (2022), the panel held "[t]he clear error standard sets a high threshold or level of certainty as to whether the error affected the outcome," requiring the court to ask whether the jury *would have*

17

reached a different verdict without the instructional error, not whether the jury *could have* reached a different verdict. *Ford*, 2023 WL 1878583, at *7. On review, Ford makes two arguments about the panel's reliance on *Berkstresser*. First, he argues *Berkstresser* should be overruled as a radical departure from this court's prior articulation of the clear error standard. Second, he argues the panel applied a higher clear error standard than that announced in *Berkstresser*.

Contrary to Ford's assertion, our decision in *Berkstresser* is not a radical departure from this court's prior articulation of the clear error standard. In *Stafford*, the case relied on by Ford, this court set forth the following test to determine whether clear error occurred: "An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict." *State v. Stafford*, 223 Kan. 62, 65, 573 P.2d 970 (1977).

This court has since noted that *Stafford* appears to be the first time this court shifted the focus of the clearly erroneous analysis "from a determination of whether the instruction was patently erroneous to a determination of whether the instruction was clearly prejudicial." *State v. Williams*, 295 Kan. 506, 513-14, 286 P.3d 195 (2012). Consistent with *Stafford*, the *Williams* court held we may reverse for clear error only when we are "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." 295 Kan. at 516. After *Williams*, this court has continued to use this language to articulate the clear error test. See, e.g., *State v. Valdez*, 316 Kan. 1, 6, 512 P.3d 1125 (2022); *State v. Carter*, 305 Kan. 139, 163, 380 P.3d 189 (2016).

Although the precise language in *Williams* differs from that used in *Stafford*, the *Williams* court did not acknowledge the difference or suggest the language was intended to change the standard for determining whether a clear error had occurred. Indeed, when

18

discussing the pre-*Williams* and *Williams* clearly erroneous tests, this court has explicitly stated that there is no difference between the two. See *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) ("We do not discern a practical difference between the stated tests, and therefore, we opt to omit the [pre-*Williams*] 'real possibility' language to avoid any confusion with the constitutional harmless error test we set forth in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* [565 U.S. 1221] [2012] [constitutional harmless error standard paraphrased as 'where there is no reasonable possibility that the error contributed to the verdict'].") Given Ford advocates for a test that is essentially the same as the test set forth in *Berkstresser*, we decline his invitation to overrule it.

In his second argument related to the panel's reliance on *Berkstresser*, Ford points to the panel's dictum stating "'[w]e likely cannot find clear error in any case in which a jury's verdict may be based on credibility'" to suggest the panel applied a higher standard for clear error than *Berkstresser* requires. See *Ford*, 2023 WL 1878583, at *8. A review of the panel's analysis shows otherwise.

> "Ford claims that the failure to give the modified *Bunyard* instruction deprived him of the opportunity for the jury to believe him and acquit him—reasoning that because he stopped immediately after M.L. withdrew her consent, he was not guilty of rape under *Bunyard* and *Flynn*. But under the Kansas Supreme Court's recent teaching about clear error in *Berkstresser*, we likely cannot find clear error in any case in which a jury's verdict may be based on credibility. The determination of M.L's and Ford's credibility was left to the jury, and we will not disturb that determination on appeal. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). And because the jury could have disbelieved Ford even if the district court had given a modified *Bunyard* instruction, *we cannot be firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred, as the clear error standard requires.*

"*In any event, under all the circumstances, this court is not firmly convinced that the jury would have reached a different verdict had the instruction error not occurred*. But even had Ford preserved the issue and we applied the standard for constitutional error that Ford urges, our result would be the same—we find beyond a reasonable doubt, in light of the entire record, that the instructional error did not affect the outcome of the trial. *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011)." (Emphasis added.) *Ford*, 2023 WL 1878583, at *8.

We conclude the panel applied the proper clear error standard.

Having concluded the panel correctly applied the clear error standard, we are now ready to apply it. The trial court instructed the jury that to find Ford guilty of rape, it was required to find that (1) M.L. did not consent to sexual intercourse and (2) the sexual intercourse occurred under circumstances when M.L. was overcome by force or fear. In support of clear error, Ford claims he would have been acquitted had the court issued a modified *Bunyard* instruction telling the jury that a rape may occur even though consent was given to the initial penetration "if the consent is withdrawn, that withdrawal is communicated to the defendant, and the sexual intercourse continues when the victim is overcome by force or fear." See *Flynn*, 299 Kan. at 1067. We disagree.

Ford testified the sexual intercourse began consensually and then immediately stopped when M.L. withdrew her consent. If the jury believed Ford's testimony that the sexual intercourse was consensual in its entirety and no portion of it was nonconsensual, it would have acquitted Ford of rape under the statutory elements. Instead, the jury found Ford guilty of engaging in sexual intercourse with M.L. without her consent. Because the jury rejected Ford's testimony claiming initial consent, we are not firmly convinced a modified *Bunyard* instruction telling the jury that a rape may occur when initial consent is withdrawn would have changed the jury's verdict. Therefore, the failure of the trial court to give an unrequested modified *Bunyard* instruction is not clear error.

20

## II. *Prosecutorial error*

Ford argues the prosecutor committed reversible error during the State's closing argument by (1) misstating the law, (2) misstating facts, and (3) diluting the State's burden of proof.

Ford did not object to any of the challenged statements, but we review prosecutorial error claims arising out of comments made during closing argument even in the absence of an objection. Even so, we may consider the presence or absence of an objection as part of our analysis of the alleged error. See *Bodine*, 313 Kan. at 406.

Appellate courts employ a two-step analysis to evaluate claims of prosecutorial error. First, we determine whether an error has occurred. Prosecutors are afforded wide latitude to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial. But it is error for prosecutors to make a comment that falls outside the wide latitude afforded in discussing the evidence and the law. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). A prosecutor's comments fall outside the wide latitude afforded if they misstate the applicable law, misstate the facts in evidence, inflame the prejudices of the jury, or improperly divert the jury's attention. *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012). "In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

Second, if we find error, we must determine whether the error prejudiced the defendant's due process rights to a fair trial—asking whether the State has shown beyond a reasonable doubt that the error did not affect the outcome of the trial, in light of the whole record, i.e., there is no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 109.

A. *Error*

1. *Misstating the law*

Ford contends the prosecutor misstated the law on the "force" element of rape during closing and rebuttal argument.

The State charged Ford with rape under K.S.A. 2017 Supp. 21-5503(a)(1)(A). The statute defines rape as "[k]nowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear." K.S.A. 2017 Supp. 21-5503(a)(1)(A). Consistent with the statute, the trial court instructed the jury that to find Ford guilty of rape, it must find that "[t]he sexual intercourse occurred under circumstances when [M.L.] was overcome by force or fear."

During closing argument, the prosecutor discussed the "force" element of rape and made the following statements suggesting that Ford began using force before the alleged rape:

- "And [Ford's] force didn't start in [M.L.]'s bedroom. The force started when he left the Kansas City area against her wishes . . . . That's him exerting force over her decision-making ability."
- "He calls [M.L.'s] phone over a dozen times . . . those early morning hours . . . of December 2nd. That's, again, evidence of Marlon Ford exerting force over [M.L.]."
- "He continues to exert his force when he asks if they can have sex. She says no. He doesn't stop there. He doesn't let it go."

22

The prosecutor later argued that during the alleged rape, Ford used force in several ways—by pinning M.L.'s arms above her head, lifting her shirt up to expose her breasts, pressing her face down so it was turned to the side, pulling down her pants, and otherwise restricting her movements.

Ford alleges the prosecutor's statements about him exerting force before the alleged rape (by traveling to Wichita to see M.L against her wishes, calling her over a dozen times before he arrived, and asking if they can have sex) misstated the law by "stretch[ing] the definition of force beyond all recognition" and "beyond all bounds of ordinary meaning." The panel rejected Ford's argument, construing the prosecutor's remarks not as defining the force necessary to satisfy the "force or fear" element of rape but instead "describ[ing] a pattern of pressure directed against M.L. leading to the rape." *Ford*, 2023 WL 1878583, at *12.

In *State v. Chaney*, 269 Kan. 10, 20, 5 P.3d 492 (2000), we intentionally "declined to define in absolute terms the degree of force required to sustain a rape conviction." Force "is a highly subjective concept that does not lend itself to definition as a matter of law." *State v. Tully*, 293 Kan. 176, 198, 262 P.3d 314 (2011) (citing *Chaney*, 269 Kan. at 20). The force necessary to sustain a rape conviction "does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that *the victim was overcome* by force or fear to facilitate the sexual intercourse." *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994).

Ford appears to acknowledge the subjective nature and degree of force necessary to sustain a rape conviction. But Ford maintains the prosecutor's statements about him exerting force before the alleged rape extends the nature and degree of force to sustain a rape conviction beyond that contemplated by statute, which necessarily renders it a misstatement of the law. Under the facts presented, we agree. The State introduced

23

evidence that M.L. did not consent to sexual intercourse. And the State also introduced evidence that Ford traveled to Wichita to see M.L. against her wishes, repeatedly called her before he arrived, and upon arrival, asked her if they were going to have sex. But contrary to the language of the statute linking the use of force to the act of sexual intercourse itself (nonconsensual sexual intercourse when the victim is overcome by force) the State did not introduce any evidence that Ford's conduct in this regard was related to the nonconsensual sexual intercourse. By suggesting Ford began using force through this conduct, the prosecutor misstated the law by extending the concept of force to conduct that occurred outside the context of the sexual intercourse act.

Ford also argues the prosecutor's comments on rebuttal misstated the law. During rebuttal, the prosecutor argued:

"Additionally, even the defendant's own statement is clear that he knew he lacked consent, because what does he tell you? Even if you were to believe his version of events, *the defendant said* [*M.L.*] *did not want to have sex without a condom*. And what did he tell you he did? *He violated her rule, her rule that she had for her body*.

"*She was not going to have sex, according to him, without a condom. And what does he do? After he decides he's going to have sex with her and he knows he doesn't have a condom available, he has her clothes removed, pulls her pants down*. Because he said it started with her pants on. He has her pants removed, gets her into position where, again, he can force himself on her, and he said he entered her vagina with his penis without a condom on. Even that, ladies and gentlemen, if you believe that version of events, that is still rape." (Emphases added.)

Ford claims the italicized language misstates the law by telling the jury that the only force required to establish rape is the act of intercourse itself. Ford correctly cites to our precedent holding that a prosecutor misstates the law "by equating the 'overcome by force or fear' element of rape with the act of sexual intercourse." *Bunyard*, 281 Kan. at 406. But contrary to Ford's argument, the italicized language in the excerpt above cannot

be construed as a statement equating the "overcome by force or fear" element of rape with the act of sexual intercourse. Instead, the prosecutor argued to the jury that Ford knew he lacked consent because he knew M.L. would not have sex without a condom. The prosecutor then pointed out that despite this knowledge, Ford admitted removing M.L.'s clothes, positioning her, climbing on top of her, and inserting his penis in her vagina without a condom. The prosecutor's comments do not argue or even imply that the only force required to establish rape was the act of intercourse. Ford's claim of prosecutorial error necessarily fails.

2. *Misstating the facts*

Next, Ford claims the prosecutor erred by misstating facts during the State's rebuttal argument cited above. Although Ford complained of three misstatements before the panel, he abandons one of them and now only focuses on two alleged factual misstatements. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (An issue not briefed is deemed waived or abandoned.); *Ford*, 2023 WL 1878583, at *13-14.

Prosecutors have wide latitude to discuss evidence and to craft arguments that include reasonable inferences drawn from admitted evidence. See *State v. Haygood*, 308 Kan. 1387, 1398, 430 P.3d 11 (2018). But a prosecutor errs when arguing a fact or factual inference without an evidentiary foundation. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021).

First, Ford complains the prosecutor misrepresented the facts about M.L.'s "condom rule." Ford claims he testified only that M.L. *preferred* he wear a condom during sex, not that she *refused* to have sex without one. But Ford mischaracterizes his testimony. When asked if M.L. talked about wanting him to wear a condom if they had sex, Ford responded affirmatively. Ford also acknowledged he was aware of M.L.'s

25

concerns about getting pregnant or contracting a sexually transmitted disease. The prosecutor's arguments about M.L.'s "condom rule" were supported by Ford's testimony and thus constituted reasonable inferences drawn from admitted evidence.

Second, Ford complains the prosecutor's statement on rebuttal that Ford "has her clothes removed, pulls her pants down" misrepresented his testimony by implying that he alone removed M.L.'s clothing. Ford points to his testimony that M.L. cooperated in removing her leggings and fully participated in the sexual activities until she withdrew her consent, at which point the sexual activities stopped.

The panel rejected this argument, reasoning the State need not credit Ford's testimony while ignoring M.L.'s testimony that Ford removed her pants and underwear. *Ford*, 2023 WL 1878583, at *13. Ford contends the panel's analysis is flawed because the prosecutor's comments were made while discussing Ford's testimony, not the State's general theory of the case. As a result, Ford alleges, the prosecutor stated facts not in evidence.

Ford is correct that the prosecutor's comments were made while discussing his testimony. But Ford testified that he helped M.L. remove her pants. Thus, the prosecutor's statement that Ford "has her clothes removed, pulls her pants down" is a fair representation of Ford's testimony and did not misstate the evidence.

3. *Diluting the State's burden of proof*

Finally, Ford argues the prosecutor diluted the State's burden of proof by misstating the law about his presumption of innocence.

During the State's rebuttal argument, the prosecutor stated:

"Ladies and gentlemen, you have an instruction that tells you it is for you to determine the weight and credit to be given to each witness. Now, the defendant, yes, *during the course of the presentation of evidence in this trial enjoys the presumption of innocence*, but he is not presumed credible. You are the one who makes that decision. You look at his statement, you look at his testimony, and you determine and you weigh it and you judge it just as harshly as you would any other witness who testified during the course of this trial." (Emphasis added.)

Relying on *State v. Decker*, 288 Kan. 306, 315-16, 202 P.3d 669 (2009), Ford claims the emphasized statement impermissibly diluted the State's burden of proof by implying that after the evidence was presented, he no longer enjoyed the presumption of innocence during closing arguments or jury deliberations.

In *Decker*, the defendant was convicted of felony murder for the death of his six-month-old daughter. 288 Kan. at 307. On appeal, the defendant challenged the following statement made during the State's rebuttal argument:

"'[The defense is] saying that [the baby's mother] shook the baby when? She shook the baby that night while she's in there feeding her putting her to bed, is that what they want you to believe? They are saying that there's a reasonable doubt about that, that you don't know who did it. Well, you do when you look at all the evidence. And another thing is *he's no longer presumed innocent*. Case is in. Evidence is in. At this point based on everything that we've proved, he's guilty.' (Emphasis added.)" 288 Kan. at 314.

This court found the prosecutor's statement that the defendant was no longer presumed innocent "an unequivocally false and erroneous statement of law concerning a basic principle of criminal jurisprudence." 288 Kan. at 315. Although a prosecutor may fairly argue that the State's evidence has overcome the presumption of innocence, we held "the State's introduction of evidence, no matter how damning, does not *terminate*

the presumption." 288 Kan. at 315. Because a rational juror could have interpreted the prosecutor's statement to mean that "once the evidentiary portion of the trial is complete, the presumption of innocence no longer applies," we found the statement exceeded the wide latitude afforded to prosecutors. 288 Kan. at 315. But we concluded the prosecutor's statement did not constitute reversible error. 288 Kan. at 316.

A prosecutor may not attempt to shift the burden of proof to the criminal defendant or misstate the legal standard about the applicable burden. *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014). A defendant is presumed innocent until proven guilty beyond a reasonable doubt. K.S.A. 21-5108. Thus, the presumption of innocence continues until jury deliberations are concluded. See *Decker*, 288 Kan. at 315 ("A jury is clearly instructed to begin deliberations presuming that the defendant is not guilty."). But when challenged, "[t]he prosecutor's comment must be evaluated in context and can be mitigated by jury instructions regarding the burden of proof." *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012).

Ford's reliance on *Decker* to support dilution of the State's burden of proof in the prosecutor's rebuttal argument is misplaced. First, the prosecutor's statement here was not as explicit as the statement in *Decker*. The prosecutor's reference to Ford's presumption of innocence was made while discussing how the jury should assess his credibility—the prosecutor explained that although Ford was presumed innocent, he was not presumed credible. Second, the prosecutor's statement was in the present tense: "[D]uring the course of the presentation of evidence in this trial [Ford] enjoys the presumption of innocence." In contrast, the prosecutor in *Decker* said the defendant was "'*no longer presumed innocent*.'" *Decker*, 288 Kan. at 314. Unlike *Decker*, the prosecutor's statement here did not convey that Ford's presumption of innocence had ended.

We conclude the prosecutor's statement did not misstate the law on his presumption of innocence or otherwise improperly dilute the State's burden of proof. This conclusion is bolstered by the trial court's instruction to the jury on Ford's presumption of innocence: "The State has the burden to prove Marlon Ford is guilty. Marlon Ford is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty."

B. *Prejudice*

The prosecutor erred by misstating the law when she extended the statutory concept of force beyond the immediate context of the sexual act. This error requires us to determine whether the error prejudiced Ford's right to a fair trial. See *Sherman*, 305 Kan. at 109. When assessing prejudice, "'[t]he focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry.'" *State v. Ballou*, 310 Kan. 591, 598, 448 P.3d 479 (2019). We may also consider the presence or absence of a defendant's objection in our analysis. *Bodine*, 313 Kan. at 411.

The misstatement of law occurred during closing argument. Review of the closing argument convinces us that the prosecutor's error suggesting Ford began using force against M.L. before the alleged rape did not contribute to the jury's verdict. See *Sherman*, 305 Kan. at 109. The prosecutor's suggestion in this regard was brief. Most of the prosecutor's closing argument on this issue was focused on M.L. being overcome by Ford's *physical force* in pinning M.L.'s arms above her head, lifting her shirt up to expose her breasts, pressing her face down so it was turned to the side, pulling down her pants, and otherwise restricting her movements to facilitate the nonconsensual sexual intercourse. As a result, we find the error was harmless.

29

III. *Constitutionality of the rape statute*

A. *Standard of review and legal framework*

Ford argues the rape statute is unconstitutionally vague. Whether a statute is constitutional presents a question of law over which this court exercises unlimited review. *Bodine*, 313 Kan. at 396.

The test to determine whether a criminal statute is unconstitutionally vague is whether it (1) fails to give fair warning of what conduct is prohibited to those potentially subject to it or (2) fails to adequately guard against arbitrary and unreasonable enforcement. *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 545, 316 P.3d 707 (2013). Ford raises his challenge under both prongs of the vagueness test.

Ford has standing to pursue both claims. To establish standing in Kansas courts, parties must satisfy a two-part test: they must demonstrate both a "'cognizable injury'" and "'a causal connection between the injury and the challenged conduct.'" *League of Women Voters of Kansas v. Schwab*, 317 Kan. 805, 813, 539 P.3d 1022 (2023). Defendants generally have standing to raise fair-notice and arbitrary-enforcement challenges to statutes under which they were convicted. Such convictions constitute concrete injuries traceable to statutes that—if the defendant is correct—either failed to give notice that the conduct was prohibited (in fair-notice challenges) or impermissibly delegated the legislative power to define crimes to other branches of government (in arbitrary-enforcement challenges). See *State v. Stubbs*, 320 Kan. ___ (No. 125,003, this day decided), slip op. at 15-26.

30

## B.  *Vagueness challenge*

The statute defines rape as "[k]nowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear." K.S.A. 21-5503(a)(1)(A). The statute also provides that "it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless." K.S.A. 21-5503(e).

### 1.  *Fair warning*

Ford argues that the rape statute violates the first prong of the vagueness doctrine by failing to clearly define what constitutes criminal behavior in post-penetration withdrawal of consent cases like his, making it difficult to understand and comply with the law. In support, Ford notes *Bunyard* and *Flynn* both recognize that a more detailed jury instruction is required in cases when consent is withdrawn after initial consensual penetration to fully explain when a defendant is criminally liable. Ford claims the requirement to give the jury a modified *Bunyard* instruction suggests the current statute does not provide enough guidance on its own.

Ford's argument is based on underlying facts unsupported by the record—that this is a post-penetration withdrawal of consent rape case. The factual basis for these type of rape cases necessarily includes sexual intercourse with initial consent, withdrawal of consent, and continuation of sexual intercourse after the alleged withdrawal of consent (under circumstances where the victim is overcome by force or fear). Although the parties testified to completely different versions of the incident, neither version includes an assertion that sexual intercourse continued after a withdrawal of initial consent. Ford testified the entire sexual encounter was consensual—they were having consensual sex, M.L. stopped the consensual sex and accused him of only wanting sex from her, and he

31

immediately stopped the consensual sex when M.L. disengaged. Conversely, M.L. testified there was never consent. So the sexual intercourse was either always consensual or never consensual. Under these facts, the rape statute provided fair warning to Ford that he would be subject to criminal liability for rape if he "[k]nowingly engag[ed] in sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear." K.S.A. 21-5503(a)(1)(A).

### 2. *Arbitrary and unreasonable enforcement*

Ford's arbitrary-enforcement challenge focuses on the portion of the rape statute defining rape as "sexual intercourse with a victim who does not consent" because "the victim is overcome by force or fear." K.S.A. 21-5503(a)(1)(A). In his view, the statute invites arbitrary enforcement because it fails to provide an objective standard for how much force or fear is needed to sustain a conviction. As a result, Ford argues, police, prosecutors, judges, and juries can apply the statute based only on a victim's "highly subjective" experience of being overcome by force or fear.

Some states include an objective-reasonableness standard in their sex-crimes statutes. See, e.g., 18 Pa. Stat. § 3121 (A person commits rape by "engag[ing] in sexual intercourse" with a person "[b]y threat of forcible compulsion that would prevent resistance by a person of reasonable resolution."); D.C. Code § 22-3003 (person commits second-degree sexual abuse when person "causes another person to engage in or submit to a sexual act . . . [b]y threatening or placing that other person in reasonable fear"); N.D. Cent. Code § 12.1-20-04 (person commits sexual imposition by "caus[ing] another to engage in a sexual act" by "[c]ompel[ling] the other person to submit by any threat or coercion that would render a person reasonably incapable of resisting").

But the force-or-fear element of the Kansas rape statute contains no such standard. See *State v. Ninh*, 320 Kan. ___, slip op. at 19-20 (No. 122,782, this day decided); *State v. Borthwick*, 255 Kan. 899, 912-13, 880 P.2d 1261 (1994). Whether a victim is overcome by force or fear is a fact question that necessarily relies on the victim's subjective experience. See 255 Kan. at 912-13. So Ford is correct that a conviction for nonconsensual sexual intercourse may turn on the highly subjective experience of the victim.

But Ford's disagreement with the Legislature's policy choice does not render the statute unconstitutionally vague. The rape statute clearly identifies what facts must be proven to convict a defendant—that the victim was overcome by force or fear and did not consent to sexual intercourse. While this standard incorporates the victim's subjective experience, it does not create the kind of indeterminacy that invites arbitrary enforcement. The force-or-fear element establishes a definable circumstance that can be demonstrated through evidence. See *Stubbs*, 320 Kan. at ___, slip op. at 20-25. And the State must prove beyond a reasonable doubt that such force or fear actually overcame the victim's will. These statutory requirements differentiate the rape statute from other vague prohibitions on "annoying" conduct or presence without "apparent purpose." See *Chicago v. Morales*, 527 U.S. 41, 60-64, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999); *Coates v. City of Cincinnati*, 402 U.S. 611, 615-16, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971). Thus, in enacting K.S.A. 21-5503(a)(1)(A), the Legislature did not improperly delegate its exclusive power to define criminal conduct to other branches of government.

In sum, we conclude that K.S.A. 21-5503 gives fair warning of prohibited conduct and includes explicit standards of enforcement. And even though a victim's fear is subjective, K.S.A. 21-5503 creates definite and precise standards that guard against arbitrary interpretation and enforcement of the statute. Thus, we reject Ford's contention that K.S.A. 21-5503 is unconstitutionally vague.

## IV. *Cumulative error*

Finally, Ford argues the cumulative effect of the alleged errors requires reversal of his conviction. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that a defendant was substantially prejudiced and denied the right to a fair trial. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021). And an unpreserved instructional issue that is not clearly erroneous may not be aggregated in a cumulative error analysis under K.S.A. 22-3414(3). *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024).

Given the findings and conclusions set forth in this opinion, we do not find cumulative error. We assumed, without deciding, that the trial court erred in failing to give a modified *Bunyard* instruction to the jury. But failing to give this instruction was not clearly erroneous, so the error cannot be considered in a cumulative error analysis. See *Waldschmidt*, 318 Kan. at 662. The only remaining error is the prosecutor's misstatement of the law during closing argument. Because the cumulative error doctrine does not apply when there is a single error, Ford's claim necessarily fails. See *Gallegos*, 313 Kan. at 277.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed. The State's conditional cross-petition for review is dismissed as improvidently granted.

\* \* \*

B<small>ILES</small>, J., concurring in part and dissenting in part:  I concur in the result. I disagree with the majority's standing analysis from *State v. Stubbs*, 320 Kan. ___ (No. 125,003, this day decided), slip op. at 16-26. I explained my reasons in that decision. *Stubbs*, 320 Kan. ___, slip op. at 27-30 (Biles, J., concurring in part and dissenting in part).

\* \* \*

S<small>TANDRIDGE</small>, J., concurring:  I agree with the majority's decision to affirm Ford's convictions. But I disagree with the majority's analysis of Ford's vagueness challenge to the rape statute, K.S.A. 21-5503, which applies a different scope of review depending on which prong of the vagueness test is being considered:  as-applied review for the fair-notice prong and facial review for the arbitrary-enforcement prong. See slip op. at 31-33; see also *State v. Ninh*, 320 Kan. __ (No. 122,782, this day decided), slip op. at 30-35 (Standridge, J., concurring and writing separately on same issue). I would follow our long-standing precedent and limit review of Ford's vagueness challenge as applied to the facts of his case under both prongs of the vagueness test. Because the majority offers no explanation for departing from precedent, a brief discussion is warranted.

Facial constitutional challenges are strongly disfavored because they "rest on speculation, run contrary to the fundamental principle of judicial restraint, and threaten to short-circuit the democratic process." *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 548, 316 P.3d 707 (2013) (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51, 128 S. Ct. 1184, 170 L. Ed. 2d 151 [2008]). That is why this court, like the United States Supreme Court, has generally limited vagueness challenges *as applied* to the specific, concrete facts of the case at hand. See *State v. Brown*, 305 Kan. 674, 698, 387 P.3d 835 (2017) ("'We consider

35

whether a statute is vague as applied to the particular facts at issue.'") (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 [2010]); *Hainline v. Bond*, 250 Kan. 217, 226, 824 P.2d 959 (1992) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand . . . . This means that the statute is judged on an 'as-applied' basis.") (quoting *United States v. Mazurie*, 419 U.S. 544, 550, 95 S. Ct. 710, 42 L. Ed. 2d 706 [1975], and *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 [1988]).

In exceptional cases, the United States Supreme Court has relaxed this prudential limit on facial vagueness challenges, most notably when the challenged law infringes constitutionally protected activity. See, e.g., *City of Chicago v. Morales*, 527 U.S. 41, 55, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (facial review justified of criminal law that infringes fundamental liberty interests); *Coates v. City of Cincinnati*, 402 U.S. 611, 615-16, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971) (same). The Court has also departed from this general rule when repeated judicial experience demonstrates that the challenged law presents an unworkable enforcement standard to satisfy the due process principles underlying the vagueness doctrine. See, e.g., *Johnson v. United States*, 576 U.S. 591, 598, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015) ("failure of 'persistent efforts . . . to establish a standard' can provide evidence of vagueness" on the face of the law) (concluding based on stare decisis analysis that the challenged law "produces more unpredictability and arbitrariness than the Due Process Clause tolerates").

Yet the majority does not cite any applicable exception that warrants facial review of Ford's vagueness challenge. Nor does the majority explain why it evaluates Ford's fair-notice challenge *as applied* to the facts of his case but his arbitrary-enforcement challenge *facially*. Indeed, the majority closely analyzes Ford's fair-notice challenge alleging that the rape statute fails "to clearly define what constitutes criminal behavior in post-penetration withdrawal of consent cases" and finds his claim is

36

unsupported based on the opposing trial testimony that "the sexual intercourse was either always consensual or never consensual." Slip op. at 31-32. Yet, when considering Ford's arbitrary-enforcement challenge, the majority evaluates the statute abstractly and determines, in conclusory fashion, that no vagueness exists because elements of the crime can be proved by evidence and must be established beyond a reasonable doubt. Slip op. at 33.

It is difficult to discern what the majority hopes to gain by this level of perfunctory facial review in arbitrary-enforcement vagueness challenges going forward. But at the very least, the majority should explain its departure from our long-standing precedent applying prudential limits in constitutional vagueness challenges. As I expressed in my concurrence in *Ninh*, also filed today, "Without any explanation as to what now drives the scope of review in constitutional challenges, I fear the majority's decision today will cause confusion for lower courts—not only when reviewing vagueness challenges but when reviewing constitutional challenges in general." 320 Kan. at __, slip op. at 33 (Standridge, J., concurring).

My position remains that we should adhere to our decades-long precedent and continue to limit our review in vagueness challenges *as applied* to the facts of the present case—under both prongs of the vagueness test—unless the challenged law warrants wider review. This established approach aligns with federal law, effectively safeguards the due process interests at stake in a vagueness challenge, and ensures that our decisions to void a state law using this powerful federal doctrine are based on the concrete facts before us, unless constitutional implications dictate otherwise. *State v. Stubbs*, 320 Kan. __ (No. 125,003, this day decided), slip op. at 30 (Standridge, J., dissenting). Thus, I would only consider whether the rape statute is vague *as applied* to the facts in Ford's case. Finding the statute provides adequate fair notice and does not invite arbitrary enforcement in light of these facts, I concur with the majority's decision to uphold Ford's rape conviction. And I join the rest of the opinion in full.