IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,181

STATE OF KANSAS,
*Appellee*,

v.

MARK HOLLEY III,
*Appellant.*

SYLLABUS BY THE COURT

1.

An instruction on self-defense is legally appropriate when the defendant is charged with a forcible felony if that defendant is not already otherwise committing a forcible felony when he or she commits a separate act of violence.

2.

A self-defense instruction is factually appropriate if competent evidence would permit a reasonable fact-finder to conclude that the defendant sincerely and honestly believed it was necessary to kill to defend the defendant or others and that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary.

3.

Proof of a probability or likelihood of harm is not required to prove child endangerment under K.S.A. 2020 Supp. 21-5601(a).

4.

In child endangerment cases, juries should consider: (1) the gravity of the threatened harm, (2) the Legislature's or regulatory body's independent assessment that the conduct is inherently perilous, and (3) the likelihood that harm to the child will result or that the child will be placed in imminent peril.

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed April 23, 2021. Convictions affirmed in part and reversed in part, sentence vacated, and case remanded to the district court with directions.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Derek Schmidt,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Mark Holley III was convicted of first-degree felony murder, two counts of aggravated robbery, two counts of child endangerment, theft, and possession of marijuana in connection with four separate events within a month of each other in 2017. Holley challenges his first-degree felony murder and child endangerment convictions on direct appeal. Holley also challenges the district court's order of lifetime postrelease supervision and Holley's restitution order. But because we reverse Holley's first-degree murder conviction and vacate his sentence, we need not address Holley's lifetime postrelease supervision and restitution issues.

## FACTUAL AND PROCEDURAL BACKGROUND

Although Holley's convictions stem from four separate events, for today's purposes we need only discuss the robbery of Timothy Albin and the murder of D'Shaun Smith. Albin contacted Holley on Facebook asking about a cell phone Holley posted for sale. Holley agreed to sell the cell phone to Albin for $80, and the two arranged to meet at Holley's house. When Albin arrived, Holley was sitting on the porch. Holley then got up, walked toward Albin's car, and sat in the front passenger seat. Albin's children—then ages one and two—sat in car seats behind Holley and Albin.

Holley gave Albin the cell phone, but Albin soon gave the phone back to Holley complaining that it was not the right model and had not been charged. As Albin tried to hand the phone back, Holley pulled out a firearm, told Albin he "knew what was going on," and demanded Albin's wallet, phone, and money. Albin requested he be able to keep his driver's license, but the man told Albin he had "five seconds to get out of here before I gas your shit." Albin handed over his belongings and drove off quickly to call the police at a nearby gas station.

About a month later, Holley shot and killed D'Shaun Smith. That day, Holley contacted Smith through Facebook Messenger to buy marijuana. Holley and Smith agreed to meet up, and Holley told Smith to not bring guns because the two were meeting at Holley's mother's daycare facility.

Emari Reed, Smith's girlfriend, drove Smith to meet Holley. As Reed and Smith pulled up to Holley's mother's daycare, Holley got into the back-passenger seat behind Smith. Smith gave Holley the marijuana, but Holley gave it back to Smith and said he was waiting on his girlfriend to come out from the duplex. A couple of minutes later, Reed claims Holley said, "This is a robbery."

3

At trial, Reed testified that Holley fired a shot at Smith after this statement. Smith fell back onto Reed and she could see blood coming from his chest and mouth. Reed tried to drive away but could not get her car moving. Unsuccessful, she stepped out of the car, screaming, and saw Smith reach for a gun under the passenger seat and stand up out of the car. Reed testified she believed Smith fired a shot back at Holley but admitted she did not see him fire or hear a gunshot. Reed stated her ears were still ringing and her vision was blurry. Smith collapsed back into the car seconds after standing and was unresponsive. By the time Reed managed to call for help, Smith had died.

At trial, Holley's version of events was quite different. He admitted to shooting Smith but claimed it was "[i]n complete self-defense." Holley claimed that while Smith and Reed initially came to Holley's to sell Holley marijuana, Holley informed them he no longer wished to buy marijuana when he got into the car. Instead, Holley offered to pay them $20 for a ride to Holley's girlfriend's house. Smith and Reed agreed to give him a ride. The car never left Holley's house, however, because when Holley pulled out the $200-$300 cash he was carrying then to pay $20 for the ride, Smith tried to grab the wad of cash from Holley's hands. Smith only managed to grab Holley's phone.

As Holley opened the door to get out of the back seat, Holley saw Smith start to reach under his seat. And when Holley closed the car door, Holley saw Smith crack open the passenger car door and point a gun out of the open passenger window. Holley, unable to run due to an old ankle injury, tried to smack the gun out of Smith's hand. Holley claimed that as he hit Smith's hand, the gun fired. Holley then recalled Smith trying to squeeze the trigger again, but nothing happened because the gun appeared to be jammed. When Smith tried to rack the slide back, Holley pulled his gun out of his pocket and fired a shot aiming at Smith's right arm to slow him down so he could run away.

4

Investigators recovered Smith's Jimenez .380 pistol, two cell phones, a shell casing from a Smith & Wesson .380 Bodyguard semi-automatic pistol, 4 grams of raw marijuana, and a digital scale from the scene around Reed's car. The Jimenez pistol was jammed and a live Hornady .380 auto caliber cartridge was stuck inside the barrel. The cartridge's primer was punched, but the round did not fire. The magazine contained four rounds of Hornady .380 auto ammunition. Investigators also lifted six fingerprints from Reed's vehicle. Two fingerprints found on the exterior rear passenger door matched Holley's left index and middle fingerprints. Later, investigators determined one of the cell phones recovered belonged to Holley.

Using media accounts linked to Holley's cell phone and tracking dogs, investigators tracked Holley to his sister's residence. After surveilling the residence for some time, police arrested Holley as he tried to drive away in a black Lexus. Holley had a stolen Smith & Wesson pistol in his possession when he was arrested.

After interviewing witnesses, investigators learned that Smith may have successfully fired a shot. Investigators searched the scene and found a bullet strike on a home north of where Reed's car was parked. While the bullet strike was visible in the painted brick of the home, there was no debris around the home to suggest it was a fresh hit. Investigators were also unable to locate a shell casing associated with this bullet.

An autopsy revealed Smith's cause of death was a gunshot wound to the trunk. The autopsy also showed this fatal round was fired at "near contact" range. Testing showed the Smith & Wesson pistol recovered during Holley's arrest matched the projectile recovered from Smith's autopsy.

The jury convicted Holley guilty as charged.

ANALYSIS

Holley challenges his first-degree murder and child endangerment convictions. First, Holley argues the district court committed reversible error in refusing a self-defense instruction. We agree. A self-defense instruction was both legally and factually appropriate in this case. And because whether Holley used self-defense boils down to a credibility question, we cannot be sure that the court's failure to instruct the jury on self-defense did not affect the outcome of this trial.

Second, we affirm Holley's child endangerment convictions. Viewing the evidence in the light most favorable to the State, the evidence is sufficient to support Holley's convictions. We find that a rational fact-finder could have found beyond a reasonable doubt that Holley knowingly placed Albin's children in danger. The State was not required to prove a probability or likelihood of harm. Probability or likelihood of harm is one of multiple factors a jury may consider.

*The district court erred in refusing to give a self-defense instruction.*

At trial, Holley requested a self-defense instruction. The district court agreed the facts supported a self-defense instruction but held that the instruction was not legally appropriate because Holley was charged with a forcible felony. The State admits that a self-defense theory was both factually and legally appropriate but argues the error is harmless. Thus, the main issue comes down to whether the district court's error is reversible.

We agree with Holley and the State that the district court erred in refusing to give a self-defense instruction because the instruction was both legally and factually appropriate. We find the district court's error reversible because whether a rational fact-finder would find that Holley used self-defense boils down to a credibility determination

6

between witnesses. Without the jury making this credibility determination, we cannot be sure that the court's failure to instruct the jury on self-defense did not affect the outcome of this trial.

We review jury instruction issues in multiple steps:

"When analyzing jury instruction issues, we follow a three-step process:

'(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

It is uncontested that Holley requested a self-defense instruction and orally argued for this instruction. Thus, Holley properly preserved the issue for appeal. Whether a party preserves a jury instruction issue affects this court's reversibility inquiry at the third step. *McLinn*, 307 Kan. at 317. Because Holley properly preserved these issues for appeal, any error is reversible only if this court determines that the error was not harmless. See, e.g., *State v. Barrett*, 309 Kan. 1029, 1037, 442 P.3d 492 (2019).

As noted, the state has conceded error and simply argues harmlessness. But before moving to a harmlessness analysis, we take a moment to confirm the parties' conclusion that the district court erred in refusing to give the self-defense instruction. To do so, we must consider whether the instructions were legally and factually appropriate, using an unlimited standard of review of the entire record. *McLinn*, 307 Kan. at 318.

7

*A self-defense instruction was legally appropriate.*

The district court erred in claiming a self-defense instruction was not legally appropriate here. The court held that K.S.A. 2020 Supp. 21-5226(a) precluded a self-defense instruction because it clearly states that "self-defense is not available to a person who is attempting to commit, committing, or escaping from the commission of a forcible felony."

The district court, however, did not adhere to our decision in *State v. Barlett*, 308 Kan. 78, 418 P.3d 1253 (2018). In *Barlett*, we disapproved our previous "general rule stated in *Bell* and *Kirkpatrick*—that a defendant charged with committing a forcible felony is not permitted to assert a theory of self-defense." 308 Kan. at 84. Instead, we held that "[t]he better rule is the one we adopt today: a defendant may not assert self-defense if that defendant is already otherwise committing a forcible felony when he or she commits a separate act of violence." 308 Kan. at 84.

Both parties agree that *Barlett* controls here making a self-defense instruction in Holley's case legally appropriate. Considering the evidence in the light most favorable to Holley, a reasonable fact-finder could have concluded that Holley was *not* otherwise committing a forcible felony when he committed the act of violence here—shooting Smith. If Holley only drew his gun in self-defense after Smith had fired or tried to fire at Holley, Holley did not otherwise commit aggravated robbery. Thus, under *Barlett*, Holley was not legally barred from claiming self-defense. But even if the self-defense instruction were legally appropriate, Holley must still show that the defense was also factually appropriate to find error.

*A self-defense instruction was factually appropriate.*

The district court, Holley, and the State all agreed that a self-defense instruction would have been factually appropriate. In other words, the parties agree that, viewing the evidence in the light most favorable to Holley, the evidence was sufficient for a rational fact-finder to find in Holley's favor. See *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012) (determining whether an instruction is factually appropriate requires the court to "determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction").

We agree. Kansas law justifies the use of deadly force only when a person reasonably believes it is necessary to prevent imminent death or great bodily harm. *State v. Qualls*, 309 Kan. 553, 557, 439 P.3d 301 (2019). To determine whether deadly force is justifiable, we use a two part test:

> "'The first is subjective and requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an objective standard and requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary. [Citation omitted.]'" 309 Kan. at 557 (quoting *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 [2012]).

A defendant's testimony, even if contradicted by all other witnesses and physical evidence, satisfies the defendant's burden as long as a rational fact-finder would reasonably conclude the defense applies. *State v. Haygood*, 308 Kan. 1387, 1405-06, 430 P.3d 11 (2018).

Viewing the evidence in the light most favorable to Holley, Holley's testimony provides sufficient evidence that Holley subjectively and objectively believed the use of deadly force was necessary. According to Holley, he believed he needed to use self-

defense after Smith tried to shoot Holley. Holley testified that Smith tried to grab Holley's $200-$300 in cash when Holley tried to pay Smith $20 for a ride. As Holley got out of the car, he saw Smith pull out a gun from underneath the seat and point it at Holley. Holley was unable to run but hit Smith's hand to avoid being shot by the first bullet Smith fired. As Holley tried to get away, he saw Smith attempt to fire at Holley again but the gun was jammed. Holley believed Smith would eventually fire and believed he needed to fire a shot at Smith in self-defense. So Holley shot at Smith's right arm to slow him down.

Physical evidence also supported Holley's testimony. Investigators determined that Smith's Jimenez pistol was jammed and a live Hornady .380 auto caliber cartridge was stuck inside the barrel. Investigators also observed a bullet strike on a nearby house north of where Reed's car was parked. Although the State's evidence may have rebutted this narrative, a defendant's testimony that he or she believed deadly force was necessary is enough to satisfy the subjective prong if a reasonable fact-finder would reasonably conclude the defense applies. See *Haygood*, 308 Kan. at 1405-06. Holley's testimony thus established Holley subjectively believed use of deadly force was necessary.

Holley's testimony also satisfies the objective standard required to show a justifiable use of deadly force. Holley's theory shows a circumstance where a reasonable person would have perceived the use of deadly force in self-defense as necessary. A reasonable person who witnessed someone trying to fire a shot at them twice and could not safely flee the scene would most likely feel the need to fire a shot in self-defense. Thus, a reasonable fact-finder could have found Holley's use of deadly force to be justifiable.

*The district court's error was not harmless.*

The parties disagree on which harmless error test analysis applies here. Holley argues our constitutional harmless error test applies because the court's refusal to give the self-defense instruction violated Holley's right to present a defense. See *State v. Andrew*, 301 Kan. 36, 47, 340 P.3d 476 (2014) (holding that when an instructional error impacts a constitutional right, this court assesses "whether the error was harmless under the federal constitutional harmless error standard, *i.e.*, whether there was 'no reasonable possibility' that the error contributed to the verdict"). The State argues that we must apply our nonconstitutional harmless error test usually applied to jury instruction claims. See, e.g., *State v. Keyes*, 312 Kan. 103, 110, 472 P.3d 78 (2020) (holding that for a jury instruction to be harmless, the State must show there is no reasonable probability the error affected the trial's outcome in light of the entire record).

Here, however, we need not determine which harmlessness test applies. Under either theory, the State has failed to prove the error was harmless. The jury was provided with competing narratives. According to Reed, Holley tried to rob Smith at gunpoint and fired the initial shot. But according to Holley, Smith tried to rob Holley by grabbing his $200-$300 cash and fired the initial shot, followed by an attempted shot that was only prevented by Smith's gun jamming.

The physical evidence supported Holley's claim that both Smith and Holley fired or tried to fire shots. Smith's Jimenez pistol was jammed and a live Hornady .380 auto caliber cartridge was stuck inside the barrel. Holley admits to shooting Smith and ballistic testing showed the Smith & Wesson Bodyguard Holley possessed at the time of his arrest matched the projectile recovered from Smith's autopsy.

11

The physical evidence, however, does not establish who fired or tried to fire their gun first. The sequence of events hinges on testimony from Reed and Holley. Thus, whether Holley used self-defense boils down to a credibility question. Without the jury making this credibility determination, we cannot be sure that the court's failure to instruct the jury on self-defense did not affect the outcome of this trial. See *Keyes*, 312 Kan. at 110. As a result, we reverse Holley's first-degree murder conviction.

*The State provided sufficient evidence to support Holley's child endangerment convictions.*

Next, Holley claims the State failed to provide sufficient evidence of child endangerment. Holley claims this offense required the State to prove Holley committed the offense "knowingly." He also claims the State failed to prove there was a reasonable probability that harm would occur.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

Thus, we must determine whether the evidence, viewed in the light most favorable to the State, is enough to convince a rational fact-finder that Holley endangered Albin's children beyond a reasonable doubt.

Under K.S.A. 2020 Supp. 21-5601(a):

> "Endangering a child is knowingly and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be endangered."

12

Holley first claims the State failed to prove Holley knowingly placed Albin's children in a situation where their life, body, or health may be endangered by failing to establish Holley knew the children were in the car. Under Kansas law:

"A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are general intent crimes." K.S.A. 2020 Supp. 21-5202(i).

Viewing the evidence in the light most favorable to the State, however, we find the State's evidence sufficient to persuade a rational fact-finder that Holley knew he put Albin's children in danger. The State's evidence showed that Holley watched Albin's car pull up to the house and Holley walked toward the car to get into the passenger seat. The children were strapped into their car seats the entire time. Albin testified that he washed his small, compact car that morning so the windows were clear. Investigators managed to lift Holley's fingerprint from the clean vehicle. Although Holley denied knowing the children were in the back seat at trial, the State's circumstantial evidence suggests otherwise. See *State v. Thach*, 305 Kan. 72, 84, 378 P.3d 522 (2016) (holding that the State may use circumstantial evidence to prove a defendant's culpable mental state). Based on the children being in plain sight and Holley having a chance to see the children from the outside of the car as well as when he was inside the car, we find that a reasonable fact-finder could find that Holley knowingly endangered Albin's children.

Next, Holley claims the State's evidence could not establish that there was a reasonable probability or likelihood that harm would occur to the children. We take this opportunity to clarify our caselaw on child endangerment and hold that a reasonable probability or likelihood of harm occurring is not required to prove child endangerment. Instead, probability or likelihood of harm is one of several factors for the jury to consider in child endangerment cases.

Holley relies on our holding in *State v. Fisher*, 230 Kan. 192, 631 P.2d 239 (1981), to argue a showing of reasonable probability or likelihood of harm is needed to prove child endangerment. The *Fisher* court noted that "[t]he wording of the [child endangerment] statute is broad, but the purpose is likewise broad; to prevent people from placing children in situations where their lives and bodies are obviously in imminent peril." 230 Kan. at 199 (analyzing an earlier version of the child endangerment statute that also required that the child's "life, body or health may be injured or endangered"). The *Fisher* court also noted, however, that the statute's use of the word "may" "means something more than a faint or remote possibility; it means that there is a reasonable probability, a likelihood that harm to the child will result." 230 Kan. at 195.

In *State v. Cummings*, 297 Kan. 716, 731, 305 P.3d 556 (2013), however, we made it clear that likelihood of harm was not a requirement:

> "[W]hile the likelihood that harm will occur is a relevant consideration, it is not the sole consideration the jury must weigh in reaching its decision. Instead, the jury should be instructed on three considerations: (1) the gravity of the threatened harm, (2) the legislature's or regulatory body's independent assessment that the conduct is inherently perilous, and (3) the likelihood that harm to the child will result or that the child will be placed in imminent peril."

14

Today, we stand by *Cummings* and hold that proof of a likelihood of harm is not required to prove child endangerment. Rather, likelihood of harm is a consideration the jury must weigh in reaching its decision along with the gravity of the threatened harm and the Legislature's assessment of whether the conduct is inherently perilous.

With those considerations in mind, we find the State's evidence sufficient to convince a rational fact-finder that Holley placed Albin's children in a situation in which their life, body, or health may have been endangered. The State's evidence showed that Holley pulled his gun out in the passenger seat of Albin's small, compact car. Holley pointed and threatened to shoot Albin in close proximity to the children. Even though the gun was pointed at Albin rather than the children, there was still a threatened harm that a bullet could ricochet or debris could have come across the children in such a confined area.

Further, according to the Legislature, Holley's conduct was inherently dangerous. In Kansas, both robbery and aggravated robbery are inherently dangerous felonies. See K.S.A. 2020 Supp. 21-5402(c)(1)(C), (D). When Holley demanded Albin hand over his wallet and threatened him with a gun, he committed aggravated robbery. K.S.A. 2020 Supp. 21-5420(b)(1). Thus, Holley involved the children in an inherently dangerous felony. See *State v. Daniels*, 278 Kan. 53, 72-73, 91 P.3d 1147 (2004) (holding that evidence of defendant planning to involve a minor in aiding and abetting in an aggravated robbery was enough evidence to uphold a child endangerment conviction). Because we find the State's evidence sufficient to support Holley's child endangerment convictions, we affirm his child endangerment convictions.

15

In conclusion, we reverse Holley's first-degree murder conviction and affirm his child endangerment convictions. Because we reverse Holley's first-degree murder conviction, we vacate his entire sentence and remand Holley's case to the district court for further proceedings. Given this, it is not necessary to address Holley's remaining claims.

Convictions affirmed in part and reversed in part, sentence vacated, and case remanded to the district court with directions.

LORI A. BOLTON FLEMING, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Fleming was appointed to hear case No. 121,181 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.