NOT DESIGNATED FOR PUBLICATION

No. 126,310

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY ANSELMO THOMAS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; KEITH SCHROEDER, judge. Submitted without oral argument. Opinion filed September 12, 2025. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

No appearance by appellee.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

PER CURIAM:  A jury convicted Anthony Anselmo Thomas of possessing methamphetamine and drug paraphernalia with intent to distribute and transporting alcohol in an open container. He appeals his drug and drug paraphernalia possession convictions, arguing insufficient evidence, jury instruction error, and erroneous admission of evidence. Finding no reversible error, we affirm.

1

On November 23, 2021, Mikel Bohringer, a canine deputy assigned to the drug enforcement unit for the Reno County Sheriff's Office, stopped a vehicle that Thomas was a passenger in. Bohringer pulled the vehicle over after he and Erik Delacruz, another deputy acting as a Bohringer's backup officer that night, saw the driver cross into both lanes of a two-lane highway and over the fog line. Delacruz tried to run the vehicle's tag for information, but the license plate had a clear cover over it, which made it difficult to read. So Bohringer activated his patrol car's emergency lights to initiate a stop. The driver of the vehicle, Bradley Kuker, initially ignored Bohringer's signal to pull over and continued to drive. When Kuker eventually complied, he stopped the car "in the middle of the road."

Once stopped, Bohringer approached the driver's side of the car. Delacruz approached the passenger side. The only occupants in the car included Kuker, the driver and owner of the car, and Thomas, who was sitting in the passenger's seat. Bohringer asked Kuker for his license and insurance. Kuker did not provide a license and instead handed Bohringer a piece of paper with his name on it that stated he did not have photo identification. Kuker then looked for his insurance by opening the glove box inside the car. When he did this, Bohringer noticed what he believed was a baggie of methamphetamine in the glove box. Bohringer then asked Kuker to step out of the car.

When Delacruz approached the car, Thomas had his window rolled only part of the way down. So Delacruz could not see Thomas' full body. As the encounter continued after Kuker left the car, Thomas eventually rolled his window all the way down. Delacruz recalled that it was a cold night, but Thomas removed his jacket during the interaction. Thomas was also very sweaty and had to wipe sweat from his forehead with his t-shirt. Delacruz also saw an open case of beer on the passenger floorboard, between Thomas' feet. At one point, Thomas asked Delacruz if he could turn the car's headlights off. After

Delacruz granted the request, Thomas removed the key—which was a key fob—from the ignition, "looked at it and then tried to place it into the glove box key hole and it didn't go." The glove box was closed at this time.

Kuker and Thomas were eventually removed from the car, arrested, and taken to separate patrol cars. Bohringer deployed his K-9 (Tonto) to perform an open-air sniff on the car. Tonto alerted to drugs near the front passenger side of the car. So the deputies returned Tonto to a kennel in Bohringer's patrol car and searched Kuker's car. Bohringer retrieved the baggie from the glove box, which turned out to be around a pound of methamphetamine. Thomas was sitting in the backseat of Bohringer's patrol car at this time and had an unobstructed view of the search. An infrared dash camera in the patrol car recorded Thomas throughout this time.

As the search continued, the deputies found an open can of beer in the passenger door and three unopened cans in the case on the floorboard. Bohringer also found a firearm under the passenger seat. The gun was loaded with a bullet in the chamber and a magazine of nine bullets. The handle of the gun was wrapped in a white bandana and its manual safety was off, so the gun was set to fire. On the driver's side, the deputies found a prescription bottle in the seat and a backpack with drug paraphernalia in it in the back seat. The backpack had identifying documents in it, indicating that it belonged to Kuker. Kuker also admitted that the backpack was his. Directly behind the driver's seat, the officer found a black magnetic hide box—a container commonly used to hide drugs that can be affixed underneath a vehicle or inside an engine block. The box had a small amount of drug residue in it. They also found a hypodermic needle with methamphetamine and what appeared to be blood inside it. Lastly, Bohringer found baggies of "synthetic marijuana" or "K2"—which generally carries a strong chemical scent—under the driver's seat.

Based on this search, the State charged Thomas with possession of more than 100 grams of methamphetamine with intent to distribute, possession of drug paraphernalia for illegal use, possession of drug paraphernalia with intent to distribute, unlawful possession of a firearm, and transportation of an open container of alcohol. The State later amended the complaint by removing the charges for possession of drug paraphernalia for use and illegal possession of a firearm.

Thomas filed a pretrial motion in limine to preclude the State from presenting any K.S.A. 60-455 evidence of prior crimes or other bad acts. He argued that evidence of his criminal history should be precluded as immaterial, irrelevant, and inadmissible. The State did not object, and the district court granted the motion. But the district court informed the parties that it reserved the ability to reconsider its ruling at trial as necessary.

After several delays, this case proceeded to a jury trial. During opening statements, the State referenced the gun found under Thomas' seat in the car. Defense counsel objected to any evidence of the gun, arguing it violated the district court's ruling on his motion in limine. Defense counsel also asked for a mistrial, arguing the evidence was irrelevant and unduly prejudicial. He added that the State's use of the evidence caused an unfair surprise because the State had dropped the firearm charge.

The State countered that the gun was relevant to show Thomas' possession of the methamphetamine and his intent to distribute. The State pointed out that Bohringer would likely testify that it was common for drug dealers to have guns, and the jury could infer that distributors carry guns to protect their drug trafficking operations. The State also specified that Thomas' criminal history would not be presented. And the prosecutor was "relying solely on the fact that the jury could draw a permissible inference . . . that drugs and guns go together."

4

The district court noted that Thomas' previous motion addressed his criminal history; it did not reference the gun. The court explained that it would prohibit any information showing Thomas was arrested for illegally possessing the firearm. Still, the district court found that the evidence had "some probative value" to the State's claim. The district court also noted that the defense could argue that Thomas was unaware of the gun or that the gun had some other legal purpose; it then found no potential for prejudice. The district court thus overruled Thomas' objection and allowed the State to present the evidence. The State later referenced the gun again in its case-in-chief and moved to admit the gun. Thomas lodged additional timely objections, which the district court also denied.

The State presented testimony from deputies Bohringer and Delacruz, Alyssa Weeks, and Clifton Riggs. Bohringer and Delacruz described the stop, search, and evidence seized from the search. Bohringer also confirmed that distribution of drug cases generally have many similarities. And in some similar cases, drugs and weapons— including firearms—are discovered together. Weeks, a forensic scientist for the Kansas Bureau of Investigation (KBI), tested the contents of the baggie and confirmed that it was over 400 grams of methamphetamine. Riggs, an evidence custodian for the Hutchinson Police Department, provided testimony regarding the evidence's chain of custody. During these witnesses' testimonies, the State admitted the gun, the baggie containing methamphetamine, a KBI report of Weeks' testing, and a dash camera video of Thomas sitting in Bohringer's patrol car as the deputies completed their search.

In the video, Thomas calls an unidentified person—presumably one or both the deputies or Kuker—profane names as he watches the deputies conduct their search. And near the end of the roughly three-minute video, Thomas states something like "he went straight to it." The State did not elicit any testimony describing Thomas' behavior or quote his comment at trial. Rather, during its case-in-chief, the State simply played the video for the jury and elicited testimony from Bohringer to provide some context for the

5

circumstances. During closing arguments, the State invited the jury to carefully review the video and to consider Thomas' statement during its deliberation.

Thomas did not testify in his defense, but defense counsel argued that Thomas was simply a passenger in Kuker's car who neither possessed nor knew about any of the items found in the car. During closing arguments, defense counsel also argued that this was a high-level drug case involving a particularly large quantity of drugs, but the State produced almost no evidence tying Thomas to the crimes. Instead, the evidence proved Kuker's guilt—he was still facing charges based on the incident and was housed in an Arkansas prison, so the State decided that Thomas needed "to take the fall" for the crimes in Kansas. Defense counsel also highlighted the following:

- Thomas did not own or drive the car;
- Thomas never confessed to the crimes, and had no cash, drugs, or other evidence of the crimes on his person;
- the State produced no DNA or fingerprint evidence tying Thomas to the drugs or gun;
- there was no body camera footage of the incident;
- no one searched Thomas' phone for evidence, such as of a prearranged sale of drugs;
- the officers did not find scales for measuring the drugs;
- the gun was not stolen or registered to Thomas, and Kuker may have placed it under the passenger seat simply because it was one of the last open spots in the car to put it;
- the testimony regarding Thomas' sweating during the stop did not prove guilt but related to Thomas' weight; and

6

- it was unreasonable to believe the State's suggestion that rather than simply riding as Kuker's passenger, Thomas acted as a bodyguard while also consuming several intoxicating beverages.

The jury submitted two questions during deliberations. The first asked whether Thomas "tr[ied]to lock the glove box prior to the officer seeing the baggy in the glove box." The second question asked whether the drug paraphernalia charge related to the items found in the backpack or the bag that contained the methamphetamine in the glove box. The parties agreed to respond that only the jury could decide these questions and to refer the jury to the first jury instruction. That instruction explained that the jury "should consider and weigh everything admitted into evidence . . . [including] testimony of witnesses, admissions or stipulations of the parties, and any admitted exhibits. . . . [and] must disregard any testimony or exhibit . . . not admit[ted] into evidence."

Following deliberations, the jury convicted Thomas as charged. Thomas moved the district court for a judgment of acquittal or a new trial. He also moved for a sentencing departure. The district court denied both motions and sentenced Thomas to a total, controlling term of 214 months' imprisonment. Before the sentencing hearing ended, Thomas asked the district court to explain its decision to allow evidence of the firearm at trial after the State dropped that charge. The district court explained that the evidence "was a part of the overall scheme" and indicated that any further argument should be decided by this court.

*Appeal and Appellate Briefing Matters*

Thomas timely appeals. The State has not filed a brief and thus does not respond to Thomas' claims. Thomas raises three issues, claiming insufficient evidence, jury instruction error, and erroneous admission of evidence. We address this latter issue first.

7

I.      *The district court did not err by allowing evidence of the gun at trial.*

Thomas argues that the evidence related to the gun was not admissible at trial because it was not probative of a material fact and was unduly prejudicial. He also asserts that because the State dismissed the illegal possession of a firearm charge before trial, he lacked adequate notice that the State planned to introduce evidence of the gun at trial.

*Standard of Review and Basic Legal Principles*

Courts must make several legal considerations when deciding the admissibility of evidence. The court must first determine whether the evidence is relevant. All relevant evidence is admissible unless it is prohibited by statute, constitutional provision, or court decision. See K.S.A. 60-407(f); *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). A material fact "has some real bearing on the decision in the case." *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022). And evidence is probative if it tends to prove a material fact. 314 Kan. at 533. Materiality presents a question of law that we review de novo without deferring to the district court's judgment. But we review the question of whether evidence is probative for an abuse of discretion. *Alfaro-Valleda*, 314 Kan. at 533.

Even when evidence is relevant, the trial court has discretion to exclude it if it finds that the probative value is substantially outweighed by its potential for causing undue prejudice. See K.S.A. 60-445; *Alfaro-Valleda*, 314 Kan. at 533. We review the erroneous admission or exclusion of evidence for harmless error under K.S.A. 60-261. See *State v. Shields*, 315 Kan. 814, 832, 511 P.3d 931 (2022).

8

*Relevance*

The State charged Thomas with possession of drugs and drug paraphernalia under K.S.A. 2021 Supp. 21-5705(a)(1), (d)(3)(D) and K.S.A. 2021 Supp. 21-5710(b). K.S.A. 2021 Supp. 21-5705(a)(1), (d)(3) prohibits possession of methamphetamine and similar drugs. K.S.A. 2021 Supp. 21-5705(a)(1), (d)(3)(D) specifically prohibits the possession of over 100 grams of such drugs, which is the largest quantity of drugs enumerated in the statute. Both K.S.A. 2021 Supp. 21-5705(a)(1), (d)(3)(D) and K.S.A. 2021 Supp. 21-5710(b) require proof of an intent to distribute.

The State's theory at trial was that Thomas not only knew about and jointly possessed the drugs and drug paraphernalia but also functioned as a guard as a part of a joint distribution scheme. Yet Thomas denied any wrongdoing and claimed no knowledge of the items found in the car. After considering these conflicting positions, the district court appropriately determined that the evidence of the gun was relevant to the State's claim that Thomas possessed and intended to distribute the contraband.

Bohringer testified that in his experience, drug cases sometimes involve weapons—including firearms. *State v. Stafford*, No. 64,915, 1991 WL 12018356 (Kan. App. 1991) (unpublished opinion) explained the logical connection between weapons and large quantities of drugs:

> "We are aware that the manufacture of illegal drugs and the possession of substantial quantities of illegal drugs are often closely associated with the possession of weapons. Weapons may, in many instances, serve as the method of securing and maintaining the possession of valuable substances such as illegal drugs and may also facilitate the illegal sale of drugs by dealers." 1991 WL 12018356, at *3.

See *State v. Williams*, No. 113,599, 2016 WL 3406639, at *4 (Kan. App. 2016) (unpublished opinion) ("Common logic and law enforcement experience supports the

9

inference that the shotgun was used in connection with drug crimes as opposed to hunting, as Williams had claimed when he was interviewed by the police."); see also *United States v. Brett*, 872 F.2d 1365, 1370 (8th Cir. 1989) ("[A] firearm . . . [is] generally considered a tool of the narcotics dealer's trade."); *United States v. Marino*, 658 F.2d 1120, 1122-24 (6th Cir. 1981) (although defendant was not charged with firearms offenses, evidence of firearms was relevant and admissible because it tended to prove intent to promote and protect the narcotics conspiracy).

Bohringer also testified that Thomas was found with a particularly "large quantity" of drugs, and the gun was found under Thomas' seat, loaded and ready to fire. Given these facts, we find the proximity of the drugs in the glove box to the gun under the passenger seat probative to the disputed issue of Thomas' intent to distribute. This proximity and Thomas' proximity to the gun were also probative of Thomas' knowledge of the drugs in the car and his possession of the drugs and drug paraphernalia. See *Stafford*, 1991 WL 12018356, at *3 (finding evidence of a gun in the cab of the truck probative to the material disputed issues of whether Stafford possessed and intended to distribute the large quantity of drugs in the bed of his truck); *Williams*, 2016 WL 3406639, at *4 (finding in dicta that the presence of a loaded gun and its proximity to drugs was "especially relevant to support the State's allegation that Williams was distributing marijuana").

Because Thomas was so close to the baggie of methamphetamine and the loaded gun, it logically follows that Thomas may have been involved in the possession and distribution crimes that the State accused him of. The evidence of the gun was thus probative to the material issues of Thomas' possession and intent.

10

*Prejudice*

Thomas argues that even if relevant, the gun evidence was unduly prejudicial. He asserts that the State's theory that he acted as "security" in a joint enterprise improperly indicated that he was "prepared to engage in violent conduct as a meth dealer."

But Thomas was not accused of possessing the firearm illegally or charged with that crime at trial. And any inference that Thomas or Kuker possessed the firearm legally had no potential for causing prejudice against Thomas. We thus agree with the district court that the prejudicial effect of the evidence did not outweigh its probative value. Cf. *Williams*, 2016 WL 3406639, at *5 (finding nothing illegal about owning a firearm and the simple fact that Williams possessed a shotgun did not, by itself, unduly prejudice him).

Thomas also claims that because the State dropped the illegal possession of a firearm charge before trial, he was unfairly surprised by the State's use of the gun evidence at trial. His motion in limine argued that "it would be incorrect, immaterial, irrelevant and inadmissible for any witness to attempt [to] comment or imply that Mr. Thomas is a suspect or has committed any uncharged crime."

Still, Thomas never included the gun in his motion, which focused on prior crimes. Nor did he raise the issue of the gun at the hearing on his motion in limine. And at the hearing, the district court asked the State whether it had any issue with Thomas' motion since the crime of illegal possession of a firearm necessarily required proof that Thomas committed at least one prior offense. The district court was unaware that the State had already dropped the charge, so the State clarified. Though present for this reference to the gun, Thomas, who knew the State had dropped the gun charge, still did not address the gun specifically.

11

Thomas also ignores his knowledge of facts that put him on notice that the State was likely to try to admit the gun as evidence at trial. Thomas knew that the deputies had found the gun under his seat during their car search, knew that the quantity of drugs found was significant, and knew that the State had accused Thomas of intending to distribute the drugs. Thomas could reasonably have inferred that the State would want to introduce evidence of the gun found so close to him.

Thomas does not support his argument that the evidence should have been precluded with any rule or appellate court decision addressing similar facts. Instead, he essentially asks us to reweigh the evidence and substitute the district court's evaluation of the pertinent facts with our own, which we will not do. We are not convinced that any evidentiary error occurred.

*Harmless Error*

But even if the district court incorrectly allowed the State to admit evidence of the gun at trial, the error was harmless. See *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018) (applying statutory harmless error standard to the improper admission of evidence that does not affect substantial rights).

The State did not allege that Kuker or Thomas owned the gun illegally. And the district court instructed the jury that the evidence of a gun in the car could not alone prove any illegality. The instruction stated that "[e]vidence and testimony have been admitted concerning a firearm found in an automobile. If you find this fact to be true, this fact in and of itself is not illegal." Although the State argued that the presence of the gun supported its case, the prosecutor also reiterated that simple possession is not an offense:

> "There's an instruction that tells you that just possessing a firearm in Kansas is not an
> offense and that is very true. Every . . . adult . . . has a right to own a firearm. You can

12

keep it in your car. You can keep it in your house. You can keep it loaded and that's perfectly legal."

Other evidence separately supported the jury's verdict, which we discuss in more depth in the next issue. In short, Thomas' proximity to the drugs and drug paraphernalia, the amount of methamphetamine, Thomas' suspicious behavior during the stop, and Thomas' comment during the search as shown in the dash camera video adequately proved his guilt despite any improper reference to the gun. Any error was thus harmless, as we find no reasonable probability that error affected the outcome of the trial in light of the entire record.

II.    *Sufficient evidence of possession supports Thomas' convictions.*

Thomas also challenges the sufficiency of the evidence supporting his possession convictions. He contends that the State engaged in impermissible inference stacking by relying on his proximity to the methamphetamine and drug paraphernalia in the vehicle to show possession. Thomas tacitly acknowledges that in addition to his proximity to the drugs, he behaved suspiciously when handling the key fob, but he argues the evidence did not show that he knew about the drugs or paraphernalia or that he jointly possessed them. Rather, Thomas maintains that the evidence proved that Kuker exclusively possessed the drugs and drug paraphernalia, and this precluded the jury from reasonably finding that he had joint possession.

*Standard of Review*

When a defendant challenges the sufficiency of the evidence to support a criminal conviction, "'we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or

13

pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). Practically speaking, this standard requires appellate courts to affirm a conviction on sufficiency grounds when some evidence in the record supports each element of the offense. See *State v. Parker*, 309 Kan. 1, 13, 430 P.3d 975 (2018) ("To meet the sufficiency standard, evidence must support each element of a crime.").

*Discussion*

The jury found Thomas guilty of possession of methamphetamine under K.S.A. 2021 Supp. 21-5705(a)(1), (d)(3)(D) and possession of drug paraphernalia under K.S.A. 2021 Supp. 21-5710(b). As the district court appropriately instructed the jury, the State was required to prove every element of each offense beyond a reasonable doubt. *State v. Chandler*, 307 Kan. 657, 669, 414 P.3d 713 (2018).

On appeal, Thomas challenges only the possession element of the offenses. When Thomas was found with the methamphetamine and drug paraphernalia, the relevant statute defined possession as "having joint or exclusive control over an item with knowledge of or intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." K.S.A. 2021 Supp. 21-5111(v). A defendant may have possession exclusively, jointly with another person, or constructively when the defendant has some measure of access and right of control. *State v. Boggs*, 287 Kan. 298, 313, 197 P.3d 441 (2008).

Thomas correctly notes that when, as here, drugs are found in a home or vehicle and the defendant does not have exclusive control of the area, mere proximity or access to drugs alone is not sufficient to sustain a conviction. *State v. Keel*, 302 Kan. 560, Syl. ¶ 2, 357 P.3d 251 (2015). Yet the State may prove possession by presenting other evidence of incriminating circumstances linking the defendant to the drugs. Such

14

evidence may include: "(1) the defendant's previous sale or use of narcotics; (2) the defendant's proximity to the area in which the drugs were found; (3) the fact that the drugs were found in plain view; and (4) the defendant's incriminating statements or suspicious behavior." 302 Kan. 560, Syl. ¶ 2. None of these factors alone are sufficient but when taken together may provide a sufficient inference of possession. *State v. Rosa*, 304 Kan. 429, 434, 371 P.3d 915 (2016).

Along with relying on circumstantial evidence to prove a crime's elements, the State may ask the jury to make reasonable presumptions and draw reasonable inferences from established facts. *Chandler*, 307 Kan. at 670. But the State cannot meet its burden of proof by relying upon inference or presumption stacking. *State v. Valdez*, 316 Kan. 1, 11-12, 512 P.3d 1125 (2022).

Viewing the record on appeal in a light most favorable to the State, we find sufficient evidence supports Thomas' convictions without stacking one inference or presumption on another. The circumstantial evidence presented at trial provided a sufficient inference of possession to allow the jury to find Thomas guilty beyond a reasonable doubt of both possession offenses without relying on improper inference stacking—asking the jury to make a presumption based on other presumptions. In other words, the State proved various circumstances to support the jury's inference that Thomas jointly or constructively possessed the drugs and drug paraphernalia.

Thomas correctly notes that the State did not present evidence of any previous sale or use of narcotics. Still, the State's circumstantial evidence showed the following: (1) Thomas was within an arm's reach of the drugs and drug paraphernalia when they were found; (2) Bohringer first saw the drugs in plain view when Kuker opened the unlocked glove box; (3) Thomas engaged in suspicious behavior when handling the key fob after Kuker opened the glove box, indicating an attempt to lock the glove box; (4) Thomas was sweating on a cold night during his interaction with the deputy; (5)

15

Thomas made a statement during the deputies' search of the car, as shown in the dash camera video; and (6) a loaded gun was under Thomas' seat, within an arm's reach.

Thomas does not agree that the State properly presented the evidence related to the gun. He does not acknowledge Delacruz' testimony about his sweating. He challenges the significance of his key fob fumbling, arguing it was unclear from Delacruz' testimony what Thomas had tried to do when he put the fob to the lock on the glove box. Thomas also states that despite reviewing the video many times, his appellate counsel was unable to hear any statements Thomas made while in the patrol car. Finally, Thomas contends that the State's evidence did not provide a basis for finding he engaged in a joint enterprise with Kuker. Although he tacitly concedes that the amount of methamphetamine was significant, he insists that quantity alone cannot establish an intent to distribute.

Thomas' characterizations of the evidence are not supported by the record. First, we have already determined that the evidence related to the gun was admissible. And the jury could reasonably infer from evidence of the gun and its location that Thomas knew about the very large quantity of drugs in the glove box. The jury heard Delacruz' testimony that it was a cold night, but Thomas removed his jacket during the interaction, was very sweaty, and wiped sweat from his forehead with his shirt. From this, the jury could have inferred that Thomas was nervous, suggesting his knowledge of the drugs. The jury also heard Delacruz' testimony that Thomas removed the key from the ignition, looked at it, and then tried to place it into the closed glove box keyhole but it did not go. The jury could reasonably have found that Thomas tried to lock the glove box and inferred that he knew of or had a part in possessing the drugs in the glove box. These pieces of evidence likewise support the reasonable inference that Thomas knew about the contraband found in the car. The jury could also reasonably infer from Thomas' actions with the key fob and his proximity to the loaded gun that Thomas had or intended to have control over the drugs.

16

The jury watched the dash camera video, as have we. During the roughly three-minute video, Thomas whistles for a dog—presumably Tonto—calls out to Kuker to see if he is in the patrol car with him, and indirectly calls someone—presumably one or both deputies or Kuker—profane names. Thomas also made a statement more relevant to the State's case near the end of the video. Although somewhat difficult to hear, Thomas stated "he went straight to it," while watching the deputies search Kuker's car. Bohringer's testimony after the video was shown to the jury explained that around the time the video started recording, an officer returned Tonto to a kennel in the patrol car Thomas was in. The deputies then initiated their search, and Bohringer removed the bag of methamphetamine from the glove box. Given this explanation, the jury may have found that Thomas said "he went straight to it" in response to Bohringer's retrieving the methamphetamine. And this evidence reasonably inferred that Thomas knew about and possessed the bag of drugs found in the glove box.

When taken together, the individual pieces of circumstantial evidence presented at trial separately support the State's theory that Thomas knew about and possessed the drugs and drug paraphernalia in the car with the intent to distribute. No inference stacking has been shown. Although Thomas lacked exclusive control over the contents of the vehicle, the State presented sufficient evidence of incriminating circumstances from which a reasonable fact-finder could conclude that Thomas possessed the drugs and drug paraphernalia. Viewing the evidence favorably to the State, we find sufficient evidence at trial to support the jury's verdict.

III.    *The district court did not clearly err by not instructing the jury on nonexclusive possession.*

Thomas' final argument alleges that the district court clearly erred by not instructing the jury on nonexclusive possession because he and Kuker had access to everything found in the car. Thomas admits that he failed to request the instruction.

When, as here, a defendant fails to request an instruction, we may review the issue for the first time on appeal. See K.S.A. 22-3414(3); *State v. McLinn*, 307 Kan. 307, 317-18, 409 P.3d 1 (2018). But the party asserting error must show the instruction was legally and factually appropriate and the failure to give the instruction was clearly erroneous. See *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023) (defendant must firmly convince appellate court that the jury would have reached a different verdict had the instruction error not occurred). Thomas asserts that the district court clearly erred by failing to instruct the jury that his mere proximity to the drugs and drug paraphernalia was not enough to prove that he possessed them.

We have unlimited review to determine whether an instruction was legally and factually appropriate. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). In doing so, we determine whether sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, would have supported the instruction. 313 Kan. at 255.

We first ask whether a jury instruction on nonexclusive possession was legally appropriate. Thomas' drug and drug paraphernalia convictions required the State to prove the essential element of possession. K.S.A. 2021 Supp. 21-5705(a)(1), (d)(3)(D); K.S.A. 2021 Supp. 21-5710(b). And when, as here, a defendant is in nonexclusive possession of a vehicle, the defendant's mere presence or access is not enough to show possession without other incriminating factors. See *Keel*, 302 Kan. 560, Syl. ¶ 2.

18

The Kansas Pattern Instructions provide a "nonexclusive possession" instruction as part of the pattern instructions for possession cases. See PIK Crim. 4th 57.040 (2022 Supp.). The instruction tells the jury that it cannot be inferred that a defendant knowingly possessed an item unless other circumstances link that item to the defendant. The instruction also lists additional evidence that the jury should consider when a defendant has nonexclusive possession of a vehicle. We find the desired instruction is legally appropriate.

We next ask whether the desired instruction was factually appropriate. The evidence at trial showed that Thomas and Kuker were both inside the car when the deputies stopped and searched the vehicle. Because of the close quarters the two shared, the instruction on nonexclusive possession was factually appropriate. See *State v. Hazley*, 28 Kan. App. 2d 664, 672-73, 19 P.3d 800 (2001).

Next, Thomas must firmly convince us that the failure to give the instruction resulted in clear error, since he failed to request it at trial. See *Bentley*, 317 Kan. at 242 (movant must firmly convince appellate court that the jury would have reached a different verdict if an instruction on lesser included offense had been given). Thomas argues that if the instruction had been given, the jury likely would have found him not guilty of illegal possession because the State presented very little evidence to prove the offenses—just his proximity to the glove box and his suspicious behavior with the key fob.

Although Thomas denied that he possessed the drugs and drug paraphernalia, he was within an arm's reach of both items. His suspicious key fob behavior during the stop, his proximity to the loaded gun, and his incriminating statement in the patrol car also support the jury's verdict.

19

Defense counsel argued that Thomas was simply a passenger in Kuker's car. Thomas' defense also alleged that Kuker, who owned and drove the car, was the sole owner of all items found. The nature of this defense compelled the jury to consider the issue of nonexclusive possession. Yet after hearing all the evidence, it decided that Thomas knew about and possessed the drugs and drug paraphernalia. Cf. *State v. Wabaunsee*, No. 126,542, 2025 WL 1010599, at *8 (Kan. App. 2025) (unpublished opinion) (applying this finding in a similar, nonexclusive possession case). Moreover, the district court properly informed the jury of the State's burden of proof.

Based on the entire record, we are not firmly convinced that the jury would have reached a different verdict if the district court had instructed on nonexclusive possession. Thomas has thus failed to establish clear error. And finding no reversible error in any of Thomas' claims, we affirm his drug and drug paraphernalia possession convictions.

Affirmed.